**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| DENNIS BURBACK, KEN EDDY and MARK ANDERSEN, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. _____ |
| ROBERT OBLON, JORDAN BROCK, JEFF BOLLINGER, JOHN THATCH, FOUROCEANS GLOBAL, LLC, FOUR OCEANS HOLDING, INC., ALCHEMIST HOLDINGS, LLC, ELEPRENEURS U.S., LLC, ELEVACITY U.S., LLC, SHARING SERVICES GLOBAL CORPORATION, CUSTOM TRAVEL HOLDINGS, INC., and DOES 1-5, | § § § § § § § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § | |

---

## COMPLAINT

---

Plaintiffs Dennis Burback, Ken Eddy and Mark Andersen file this Complaint against Robert Oblon, Jordan Brock, Jeff Bollinger, John Thatch, FourOceans Global LLC, Four Oceans Holding, Inc., Alchemist Holdings, LLC, Elepreneurs U.S., LLC, Elevacity U.S., LLC, Sharing Services Global Corporation, Custom Travel Holdings, Inc., and Does 1-5 and would respectfully show the Court as follows:

## I.
## THE PARTIES

1.     Dennis Burback ("Burback") is an individual residing in Washougal, Washington.

2.     Ken Eddy ("Eddy") is an individual residing in Vancouver, Washington.

3.      Mark Andersen ("Andersen") is an individual residing in Bend, Oregon.  Andersen, together with Burback and Eddy, are collectively referred to as "Plaintiffs."

4.      Robert Oblon ("Oblon") is an individual whose last known residence in Collin County, Texas.  Oblon can be served with process at his last known address at 5008 Stonewick Court, Plano, Texas 75093, or wherever he may be found.

5.      Jordan Brock ("Brock") is an individual residing in Denton, County, Texas.  Brock can be served with process at 908 Sir Constantine Drive, Lewisville, Texas 75056, or wherever he may be found.

6.      Jeff Bollinger ("Bollinger") is an individual residing in West Jordan, Salt Lake County, Utah.  Bollinger can be served with process at 1755 W 8760 S West Jordan, UT 84088, or wherever he may be found.

7.      John "JT" Thatch ("Thatch") is, upon information and belief, an individual residing in Collin County.  Thatch can be served with process at 1700 Coit Road, Suite 100, Plano, Texas 75075, or wherever he may be found.

8.      FourOceans Global, LLC ("FOG") is a Texas limited liability company previously registered to do business in the State of Texas, with its principal place of business located in Frisco, Collin County, Texas.  FOG can be served with process by serving either its president, Robert Oblon at his last known address at 5008 Stonewick Court, Plano, Texas 75093, or wherever he may be found, or one of its principals, Jordon Brock at 908 Sir Constantine Drive, Lewisville, Texas 75056, or wherever he may be found.

9.      Four Oceans Holding, Inc. ("FOHI") is a Nevada corporation with its principal place of business located Las Vegas, Clark County, Nevada.  FOHI can be served with process

through its registered agent for service of process, Corporation Service Company, 112 North Curry Street, Carson City, Nevada 89703.

10.     Alchemist Holdings, LLC ("Alchemist") is a Delaware limited liability company doing business in the State of Texas, with its principal place of business located in Frisco, Collin County, Texas.  Alchemist can be served with process through its purported controlling owner, Jordan Brock at 908 Sir Constantine Drive, Lewisville, Texas 75056, or wherever he may be found.

11.     Elepreneurs U.S., LLC f/k/a Elepreneur LLC ("Elepreneurs") is a Texas limited liability company registered to do business in the State of Texas, with its principal place of business located Plano, Collin County, Texas.  Elepreneurs can be served with process through its registered agent for service of process, Jones, Davis & Jackson, PC, 15110 Dallas Parkway, Suite 300, Dallas, Texas, 75248.

12.     Elevacity U.S., LLC f/k/a Elevacity Global, LLC ("Elevacity") is a Texas limited liability company registered to do business in the State of Texas, with its principal place of business located in Dallas, Dallas County, Texas.   Elevacity can be served with process through its registered agent for service of process, Jones, Davis & Jackson, PC, 15110 Dallas Parkway, Suite 300, Dallas, Texas, 75248.

13.     Sharing Services Global Corporation f/k/a Sharing Services, Inc. ("SHRG"), is a Nevada corporation registered to do business in the State of Texas, with its principal place of business located in Plano, Collin County, Texas. SHRG can be served with process through its registered agent for service of process, Ankit Jain, 30211 Avenida De Las Banderas, Suite 200, Rancho Santa Margarita, California, 92688.

14.     Custom Travel Holdings, Inc. ("CTH"), is a Utah corporation with its principal place of business located in Salt Lake City, Salt Lake County, Utah. CTH can be served with

process through its registered agent for service of process, Fortius Financial Advisors, LLC, 4001 South 700 East, Suite 500, Salt Lake City, Utah.

15.     The true name and/or capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 - 5, inclusive, are unknown to Plaintiffs who have sued these defendants by such fictitious names.  Plaintiffs will amend this Complaint to show their true names and/or capacities when the same have been ascertained.  Upon information and belief, and as will be shown in the course of discovery in this case, Defendants Does 1 - 5 are comprised of one or more of the following: individuals, companies (including parent, subsidiary, and/or affiliated companies of the named corporate defendants) and/or their owners and/or investors, and/or their respective attorneys or agents, who, at a minimum, participated and/or conspired with one or more of the named defendants to perpetuate the frauds and schemes as alleged herein, to allow for the diversion of Plaintiffs' investment monies and ownership interests in FOG ultimately into SHRG. Does 1-5 are, in some manner, responsible for the events and happenings referred to herein as participants and/or co-conspirators, either contractually or tortiously, and caused damages to the Plaintiffs as alleged.  Does 1-5, together with Oblon, Brock, Thatch, Bollinger, SHRG, FOG, FOHI, Alchemist, and CTH, are collectively referred to as "Defendants."

## II.
## JURISDICTION AND VENUE

16.     Defendants are subject to the jurisdiction of this Court. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. This Court has personal jurisdiction over each defendant. Defendants continuously and systematically engage and/or engaged in business in Texas, including this judicial district.

17.     SHRG operates its business in Texas in this judicial district, and a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.  Venue is proper in this Court pursuant to 28 U.S.C. §1391.

## III.
## FACTUAL BACKGROUND

### A.     *The Individual Defendants*

18.     Oblon holds himself out as a "respected, recognized figure of the world of direct selling," and that he "became a meta-search pioneer and online travel expert, and has enjoyed a significant amount of success in network marketing."[1]

19.     Oblon holds himself out as the founder of  FOG, a multilevel marketing company that, among other things, held itself out as a "leading lifestyle and professional development learning and experiential social selling company focused on a positive, meaningful life defined and attained through 'sustained happiness,'"[2] and that it was "originally launched in 2014 as a vacation club specializing in personal development, featuring training from world renown success coaches and trainers. . ."[3]

---

[1] *See* Exhibit A, Oblon v. Brock, Cause No. 19-7298-367, in the 367th District Court, Denton County, Oblon's Original Petition and Request for Disclosures at IV.1; *See also* Exhibit B, Networking Times, Spring 2019.  Accessible at:
 https://issuu.com/networkingtimesmag/docs/issuu_nt_feb2019_1801/s/80207 (last accessed Dec. 9, 2020).
[2] *See* Exhibit C, FourOceans Global, LLC, April 6, 2015, Press Release Accessible at: https://www.prnewswire.com/news-releases/happiness-begins-today-with-launch-of-four-oceans-300061359.html (last accessed Dec. 9, 2020).
[3] *See* Exhibit D, Sharing Service, Inc., October 9, 2017, Press Release   Accessible at: https://www.globenewswire.com/news-release/2017/10/09/1142762/0/en/Sharing-Services-Inc-Announces-the-Acquisition-of-Four-Oceans-Holdings-Inc-a-Travel-Centric-Direct-Selling-Company-with-New-Products-and-Services.html (last accessed December 9, 2020).

20.     Oblon also holds himself out as the founder of FOHI, a multilevel marketing company that engages in the direct sale of travel-related goods and services through various independent associates located throughout the State of Texas, including Collin County.

21.     Oblon also holds (or has held) himself out as the founder (or co-founder) of Alchemist, the largest shareholder of SHRG.  Upon information and belief, Oblon is (or was) the largest interest holder in Alchemist.

22.     Oblon also holds himself out as the founder of Elepreneurs, a multilevel marketing company that, among other things, sells products, services, and business opportunities.

23.     Oblon also holds himself out as the founder of Elevacity, a multilevel marketing company that, provides certain products sold by members of Elepreneurs.

24.     Oblon served as the Chairman of SHRG's predecessor-in-interest, Sharing Services, Inc. ("SSI") beginning on or about November 27, 2017.[4]  As the Chairman of SHRG, Oblon was authorized to represent SHRG's interests (and those of its subsidiaries) and had actual authority or, at a minimum, apparent authority, to enter into agreements on SHRG's behalf and bind it to such agreements.

25.     Brock served as the President, CEO, and Chairman of the Board of Directors of SHRG from as early as 2017, and as President and CEO up to on or about March 1, 2018.  As the President, CEO and Director of SHRG, Brock was authorized to represent SHRG's interests (and those of its subsidiaries) and had had actual authority or, at a minimum, apparent authority, to enter into agreements on SHRG's behalf and bind it to such agreements.

---

[4] Unless specifically noted herein, SHRG and SSI are collectively referred to as SHRG.

26.     Upon information and belief, Brock was a co-founder, member, agent, and/or representative of FOG.  Upon information and belief, Brock raised investment capital for FOG on FOG's and/or Oblon's behalf.

27.     Brock holds (or has held) himself out as the founder (or co-founder) of  Alchemist.  Upon information and belief, Oblon is (or was) one of the largest interest holders in Alchemist.

28.     Bollinger is the purported President of CTH.  Bollinger is a financial advisor who, over the years, has worked closely with Oblon and companies with which Oblon is or was affiliated, including, upon information and belief, Alchemist, FOG, and FOHI, and CTH.  As the President of CTH, Bollinger was authorized to represent CTH's interests (and those of its subsidiaries) and had actual authority or, at a minimum, apparent authority, to enter into agreements on their behalf and bind them to such agreements.

29.     Upon information and belief, Bollinger and his financial advisory company, Fortius Financial Advisors, LLC, which is also the registered agent for CTH, were subject to a cease-and-desist proceeding and remedial sanctions instituted by the Securities and Exchange Commission ("SEC") due in part to Bollinger's misconduct stemming from his company's investment fund investing $800,000 in unsuitable, illiquid investments, which, upon information and belief, a portion of which were loaned to a company that "sells travel packages" in which Bollinger had a direct financial interest and, thus, a conflict of interest.  Upon information and belief, the company to which the money was loaned, was a company owned or controlled by Oblon.  This proceeding was ultimately resolved in August 2016, with Bollinger and his advisory company agreeing to cease and desist from further securities violations, a censure, the disgorgement of money, and the payment of fines and interest.

30.     Thatch became the President, CEO and Director of SHRG on or about March 1, 2018, and is now the current President, CEO, and a Director of SHRG.  As the President, CEO and a Director of SHRG, Thatch was authorized to represent SHRG's interests (and those of its subsidiaries) and had actual authority or, at a minimum, apparent authority, to enter into agreements on their behalf and bind them to such agreements.

**B.     *The Corporate Defendants***

31.     SHRG, the successor entity of SSI, is a publicly traded company.[5]

32.     SHRG has held out to the public that FOHI is the "successor entity to FourOceans Global LLC."[6]  SHRG has also held out to the public that FOHI is the "new Four Oceans [that would] pick up where we left off with a whole new business model, but still very travel centric …"[7]  SHRG has also held out to the public that Oblon was "an accomplished and recognized leader in the travel industry," and that he "recently brought his established Four Oceans Global company and its subsidiary platforms into Sharing Services, which many leaders in both the travel and direct selling industries have joined under his leadership and proven track record."[8]

33.     Elepreneurs is a  multilevel marketing company that engages in, among other things selling products, services, and business opportunities.

34.     Elevacity is a multilevel marketing company that engages in the provision of certain products sold by members of Elevacity.

---

[5] Unless specifically noted herein, FOG and FOHI are collectively referred to as FOG.
[6] *See* Exhibit D.
[7] *Id*.
[8] *See* Exhibit E, Sharing Service, Inc., November 27, 2017, Press Release  Accessible at: https://www.globenewswire.com/news-release/2018/03/05/1415180/0/en/Sharing-Services-Inc-Announces-the-Appointment-of-New-Chief-Executive-Officer.html (last accessed  December 9, 2020).

35.     According to SHRG's public filings with the SEC, FOHI, Elepreneurs, and Elevacity are wholly owned subsidiaries of SHRG that were acquired by SHRG on or about October 9, 2017.

36.     Upon information and belief, the principal assets of FOG, which include, among other things, FOG's network marketing software platform, its individual product distributors, email lists, phone lists, customer lists, all of which comprise FOG's proprietary and/or trade secret information, were transferred (secretly or otherwise) to Elepreneurs, Elevacity, and/or FOHI, whether by name change, consolidation, merger, or otherwise, or were surreptitiously transferred to and otherwise held by one of these entities at the time they were acquired by SHRG on or about October 9, 2017.   In other words, the principal assets of FOG were held out by Elepreneurs, Elevacity, and/or FOHI as their own assets at the time of SHRG's acquisition of these entities, which, upon information and belief, are currently being held by and utilized in whole or in part by SHRG or its subsidiaries today.

37.     As recently as October 10, 2019, Oblon falsely held himself out as the President of FOG, the predecessor in interest of FOHI, which is now wholly owned by SHRG.   These representations were made despite SHRG's acquisition of FOHI and despite the fact that FOG has purportedly been involuntarily dissolved by the Texas Secretary of State.

38.     FOHI is a multilevel marketing company that engages in the direct sale of travel-related goods and services through various independent associates located throughout the State of Texas including Collin County.  FOHI was acquired by SHRG on or about October 9, 2017.

39.     Upon information and belief, Alchemist is the largest shareholder of SHRG and was used to further the fraudulent schemes of the Defendants as alleged herein.  A dispute arose over the ownership, management and control of Alchemist by and between Oblon, Brock and

SHRG, with at least two lawsuits that were recently pending Texas state court to address these issues, among others:  (1)  *Sharing Services Global Corporation f/k/a Sharing Services, Inc., et al. v. Robert Oblon*, Cause No. 366-04941-2019, in the 366th District Court of Collin County, and (2) *Robert Oblon v. Jordan Brock*, Cause No. 19-7298-367, in the 367th District Court of Denton County, Texas.[9]

40.     Upon information and belief, CTH is a holding company used to commit and further the fraudulent schemes of the Defendants as alleged herein.  Upon information and belief, CTH shares (or portions thereof) have allegedly been (or proposed to be) transferred to and exchanged into SHRG shares owned by or being held by Alchemist.

C.     *The Schemes*

1.  *Oblon, FOG, Does 1-5 and, upon Information and Belief, Brock Schemed to Procure Plaintiffs' Investments in FOG Through Fraud and Deception and in Violation of the Securities Laws – The Promissory Note-Fraud Schemes*

41.     Defendants Oblon and FOG fraudulently solicited investments from individuals, including Plaintiffs, on behalf of FOG.  Upon information and belief, Defendant Brock, as well as Does 1-5, also fraudulently solicited investments from individuals on behalf of FOG, and were aware of the fraudulent solicitation of Plaintiffs' investments.

42.     Oblon sold FOG promissory-note securities in unregistered transactions to Plaintiffs.[10]  As a result of Oblon's fraud, and pursuant to the fraudulent schemes alleged herein, Plaintiffs each invested $33,333.00 in FOG on or about September 10, 2015, and purchased the FOG promissory-note securities in unregistered transactions.

---

[9] Upon information and belief, according to SHRG's filings with the SEC on or about March 12, 2020, these lawsuits were resolved.

[10] It is unknown how much total capital was raised from all investors in connection with the FOG promissory-note securities, but, upon information and belief, and in addition to Plaintiffs, there were more than two-dozen additional investors in FOG.

43.     Each of Plaintiffs' investments were memorialized by identical or nearly identical Note Purchase Agreements entered into by Plaintiffs, on the one hand, and FOG, on the other. Each of the Note Purchase Agreements were executed on FOG's behalf by Oblon, FOG's purported Manager. The Note Purchase Agreements (including the promissory notes, but excluding the Purchaser Questionnaires completed by Plaintiffs that were purposefully omitted by Oblon following execution) are attached hereto as Exhibit F (Burback), Exhibit G (Eddy), and Exhibit H (Andersen).

44.     Prior to the execution of the Note Purchase Agreements, Oblon represented to Plaintiffs that FOG was insolvent and on the verge of collapsing despite the investments of dozens of individuals.   As a result, and according to Oblon, Plaintiffs investments were of utmost importance to Oblon and FOG, and were necessary to prevent FOG from collapsing.

45.     Oblon was desperate and, based on his representations to Plaintiffs, without Plaintiffs' investments, FOG would collapse.  As a result of Plaintiffs' investments, FOG survived and the business moved forward.  To reward Plaintiffs for their risk, and the importance of their comparatively large investments necessary to save FOG, Defendants Oblon and FOG gave Plaintiffs what could be characterized as "sweetheart" investment deals.   Specifically, Plaintiffs' Note Purchase Agreements with FOG guaranteed that each of the Plaintiffs, in addition to the purchase of the promissory-note securities, would receive the following:

> (a) a five percent (5%) revenue share of the Four Oceans Bonus Pools;
>
> (b) a seat on the Field Leadership Advisory Board,
>
> (c) a return of their investment, plus 12% interest to be paid in 12 equal payments starting less than a year after they invested, and

(d) a five percent (5%) equity membership interest in FOG.[11]

46.     FOG was originally conceived as a multilevel marketing, travel membership program it was also held out as the "leading lifestyle and professional development learning and experiential social selling company focused on a positive, meaningful life defined and attained through 'sustained happiness.'"[12] This latter described business component of FOG was continued and included through other businesses owned and operated by Oblon and SHRG.

47.     Despite Plaintiffs' investments in FOG, there were inordinate delays with the development of an adequate web-based portal for FOG members, among other things.  Upon information and belief, FOG failed to pay vendors, including the vendor for the web-based portal for FOG members.

48.     Notwithstanding these delays, Plaintiffs set out to do what they intended, and began recruiting associates and other members to sell FOG products and services, conducting webinars and other tasks in order for FOG to succeed.  Despite their efforts, Defendants Oblon and FOG never paid Plaintiffs their interest earned on their investments, the commission monies Plaintiffs earned as part of the multilevel marketing compensation program, as well as the individuals that Plaintiffs recruited for their services.

49.     It soon became apparent to Plaintiffs in the approximately February to March 2016 timeframe that, for reasons unknown to Plaintiffs, Oblon had failed and FOG would be a failure. After Defendants Oblon and FOG were dropped by the vendor of the web-based network marketing platform for non-payment, Defendant Oblon falsely promised Plaintiffs that a new web-

---

[11] In addition, Defendant Oblon falsely represented and promised to the Plaintiffs that they would receive an additional seven percent (7%) equity interest in FOG that would be split equally among them, ultimately giving each of Plaintiffs a 7.33% equity interest in FOG.

[12] *See* Exhibit C.

based travel portal would be developed and consistently told Plaintiffs that he was "close" to something big, and to just hang in there with him and they would reap untold rewards. Shortly thereafter, upon information and belief, Defendant Oblon formed other similar multilevel marketing-related companies, Elepreneurs and Elevacity, both of which are now subsidiaries of SHRG.

50.     In light of these developments, Defendant Oblon approached Plaintiffs to discuss pivoting FOG into other business ventures, while Plaintiffs would remain part of the ownership team and maintain the same compensation and equity structure they held through FOG in accordance with the Note Purchase Agreements.

51.     In approximately March or April of 2016, Defendant Oblon informed Plaintiffs that the FOG business plan, model, and its principal assets were migrated into the Elevacity and/or Elepreneurs ventures. Oblon had taken this step without informing FOG members, including Plaintiffs, and without FOG membership input or vote, in breach of his fiduciary duties to FOG and its members, including Plaintiffs. This migration to Elevacity and/or Elepreneurs was premised on notion that FOG's assets and its business model, as set out in the Note Purchase Agreements, would be utilized for these ventures, and despite the new product lines associated with these new entities (which was inconsequential to the business plan and model of the new entities, which mirrored those of FOG), Plaintiffs were still to be treated as part of the ownership team with the exact same compensation plan and with the same equity ownership as set forth in the Note Purchase Agreements. However, this also included Defendant Oblon's promise of an additional 7% equity in the new ventures to be split equally among Plaintiffs, thus bringing Plaintiffs' collective equity ownership to 22%, *i.e.*, 7.33% equity for each of the Plaintiffs.

52.     No monies were paid Plaintiffs pursuant to the Note Purchase Agreements as part of their revenue share.

53.     No revenue share from the Four Oceans Bonus Pools were ever paid to Plaintiffs pursuant to the Note Purchase Agreements.

54.     Plaintiffs were never appointed to advisory board positions.

55.     Plaintiffs investment monies and interest thereon were not paid pursuant to the Note Purchase Agreements.

56.     None of the Plaintiffs were ever paid pursuant to their respective 5% equity interests in FOG or, as promised, any other entity subsequent to its acquisition.

57.      None of the Plaintiffs were ever paid all of their earned commissions under the FOG multilevel marketing compensation program.

58.     Unbeknownst to Plaintiffs, at some point after Plaintiffs' execution of the Note Purchase Agreements, Defendant Oblon and, upon information and belief, Brock and Does 1-5, utilized Plaintiffs' investments for their own personal advantage and for personal gains, as well as a springboard for the future acquisition of FOG, as well as Elepreneurs and Elevacity by SHRG – with an eye toward excluding Plaintiffs from their ownership interests and the proceeds resulting from the acquisitions.

59.     Upon information and belief, Plaintiffs' investments in FOG were used by at least Defendant Oblon and, upon information and belief, Brock and Does 1-5, to enrich themselves to the detriment of Plaintiffs in order to cover personal expenses and/or for personal gains, among other things, as well as Ponzi payments to other similarly situated investors in FOG (or other failed Oblon ventures) to keep the Promissory Note-scheme (and other Oblon schemes) afloat.

60.     Prior to the execution of the Note Purchase Agreements on or about September 10, 2015, and throughout the negotiations that occurred from approximately late-July 2015 leading up to the execution of Note Purchase Agreements, Oblon represented to Plaintiffs that FOG was a legitimate business enterprise.  This representation was false and Oblon either knew it was false at the time the representation was made, or made the false representation without regard to its truth or falsity. Oblon also failed to correct these false representations after the execution of the Note Purchase Agreements.  Plaintiffs relied on Oblon's representations and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  But for Oblon's representation, Plaintiffs would not have made these investments in FOG.

61.     On or about August 30, September 1, September 2, September 8, and/or September 9, 2015,  during one or more phone calls with Plaintiffs, and prior to the Plaintiffs' execution of the Note Purchase Agreements, Oblon represented to Plaintiffs, that  Plaintiffs' investments would be utilized to pay FOG's vendors, including the vendor for the web-based portal for FOG members. These representations were false and Oblon either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity. Oblon also failed to correct these false representations after the execution of the Note Purchase Agreements.  Plaintiffs relied on Oblon's representations and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  But for Oblon's representation, Plaintiffs would not have made these investments in FOG.

62.     On or about August 30, September 1, September 2, September 8, and/or September 9, 2015, during one or more phone calls with Plaintiffs, and prior to the Plaintiffs' execution of the

Note Purchase Agreements, Oblon represented to Plaintiffs  that Plaintiffs' investments would be used to pay FOG-member distributors, including those member distributors recruited by Plaintiffs. These representations were false and Oblon either knew they were false at the time the representation was made, or made the false representations without regard to their truth or falsity. Oblon also failed to correct these false representations after the execution of the Note Purchase Agreements.  Plaintiffs relied on Oblon's representations and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  But for Oblon's representation, Plaintiffs would not have made these investments in FOG.

63.     During the negotiations that occurred from approximately late-July 2015 leading up to the execution of Note Purchase Agreements, prior to the Plaintiffs' execution of the Note Purchase Agreements, Oblon failed to disclose to Plaintiffs that Plaintiffs' investments would not be used for legitimate business purposes of FOG but that they would instead be used by Defendant Oblon and, upon information and belief, Brock and Does 1-5, to enrich themselves to the detriment of Plaintiffs in order to cover personal expenses and/or for personal gains, among other things, as well as for Ponzi payments to other similarly situated investors in FOG (or other failed Oblon ventures) to keep the Promissory Note-scheme (and/or other Oblon schemes) afloat.  Oblon also failed to disclose this information after the execution of the Note Purchase Agreements. Defendants Oblon and, upon information and belief, Brock and Does 1-5, had a duty to disclose these facts because they knew that, at a minimum, Oblon: (1) owed a fiduciary duty to Plaintiffs at least after the execution of the Note Purchase Agreements; (2) made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that made

his earlier representations to Plaintiffs untrue or misleading.  Plaintiffs relied on Oblon's silence/omissions and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  Had Oblon not stayed silent and disclosed the true state of affairs, Plaintiffs would not have made these investments in FOG.

64.     During the negotiations that occurred from approximately late-July 2015 leading up to the execution of Note Purchase Agreements, prior to the Plaintiffs' execution of the Note Purchase Agreements, Oblon failed to disclose to Plaintiffs that Plaintiffs' investments would serve as a springboard for the future acquisition of FOG, or at a minimum, FOG's assets (as alleged above), as well as Elepreneurs and Elevacity, by SHRG – with an eye toward excluding Plaintiffs from their ownership interests in FOG and the proceeds resulting from the acquisitions.  Oblon also failed to disclose this information after the execution of the Note Purchase Agreements. Defendants Oblon and, upon information and belief, Brock and Does 1-5, had a duty to disclose these facts because they knew that Oblon: (1) owed a fiduciary duty to Plaintiffs at least after the execution of the Note Purchase Agreements; (2) made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that made his earlier representations to Plaintiffs untrue or misleading.  Plaintiffs relied on Oblon's silence/omissions and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  Had Oblon not stayed silent and disclosed the true state of affairs, Plaintiffs would not have made these investments in FOG.

65.     During the negotiations that occurred from approximately late-July 2015 leading up to the execution of Note Purchase Agreements, prior to the Plaintiffs' execution of the Note Purchase Agreements, Oblon failed to disclose to Plaintiffs that FOG's principal assets, as alleged above, would be transferred (secretly or otherwise) to successor, related and/or Oblon-controlled entities (whether by name change, consolidation, merger or otherwise), including Elepreneurs, Elevacity and/or, FOHI – with an eye toward excluding Plaintiffs from their ownership interests in FOG and the proceeds resulting from the acquisitions of these entities by SHRG.  Oblon also failed to disclose this information after the execution of the Note Purchase Agreements. Defendants Oblon and, upon information and belief, Brock and Does 1-5, had a duty to disclose these facts because they knew that Oblon: (1) owed a fiduciary duty to Plaintiffs at least after the execution of the Note Purchase Agreements; (2)made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that made his earlier representations to Plaintiffs untrue or misleading.  Plaintiffs relied on Oblon's silence/omissions and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  Had Oblon not stayed silent and disclosed the true state of affairs, Plaintiffs would not have made these investments in FOG.

66.     During the negotiations that occurred from approximately late-July 2015 leading up to the execution of Note Purchase Agreements, prior to the Plaintiffs' execution of the Note Purchase Agreements, Oblon failed to disclose to Plaintiffs that Plaintiffs' investments in FOG were nothing more than a ruse to steal their money for his benefit and the benefit of others, including the defendants named herein. Oblon also failed to disclose this information after the

execution of the Note Purchase Agreements.  Defendants Oblon and, upon information and belief, Brock and Does 1-5, had a duty to disclose these facts because they knew that Oblon: (1) owed a fiduciary duty to Plaintiffs at least after the execution of the Note Purchase Agreements; (2) made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that made his earlier representations to Plaintiffs untrue or misleading.  Plaintiffs relied on Oblon's silence/omissions and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  Had Oblon not stayed silent and disclosed the true state of affairs, Plaintiffs would not have made these investments in FOG.

67.     Immediately upon SHRG's acquisition of FOHI, the predecessor in interest of FOG, whether by name change, consolidation, merger or otherwise, two of the four members of the SHRG Board of Directors who also acted as officers of SHRG (*i.e.*, Defendants Oblon and Brock), with actual and apparent authority to act on SHRG's behalf, and had direct, firsthand personal knowledge of the fraud and the fraudulent Promissory Note-Fraud scheme alleged herein, thus providing SHRG with actual knowledge (or, at a minimum, constructive knowledge) of the fraud and the fraudulent schemes.

68.     Subsequent to SHRG's acquisition of FOHI, the predecessor in interest of FOG, whether by name change, consolidation, merger or otherwise, a third member of the four members of the SHRG Board of Directors who also acted as an officer of SHRG (*i.e.*, Defendant Thatch), with actual and apparent authority to act on SHRG's behalf, learned of the fraud and the fraudulent Promissory Note-Fraud scheme alleged herein, thus providing SHRG with actual knowledge (or, at a minimum, constructive knowledge) of the fraud and the fraudulent schemes.

69.     Subsequent to SHRG's acquisition of FOHI, the predecessor in interest of FOG, whether by name change, consolidation, merger or otherwise, Defendants SHRG, FOHI and Alchemist became aware of the terms of the Note Purchase Agreements, with full knowledge that they were procured through at least Oblon's fraud, as well as, upon information and belief Brock's and Does 1-5's fraud, and pursuant to Promissory Note-Fraud scheme alleged herein.

70.     As alleged in subsequent paragraphs, Defendants SHRG, FOHI, Brock (to the extent not already known), Thatch (to the extent not already known), Bollinger, CTH and Alchemist, subsequently learned of Oblon's fraud perpetrated on Plaintiffs, had full knowledge of the fraud and fraudulent schemes alleged herein, had a duty to disclose these schemes to Plaintiffs, but conspired, aided and abetted and perpetrated additional frauds upon Plaintiffs, along with each of the corporate defendants, to cover their tracks and conceal their unlawful conduct, and then subsequently committed separate fraudulent acts in conjunction with Oblon, Brock, Thatch, Bollinger, Alchemist, and CTH, against Plaintiffs..

71.     Plaintiffs' investments in FOG stemming directly from the Promissory Note-Fraud scheme, ultimately directly benefited and enriched Oblon, Brock, Thatch, FOG, FOHI, SHRG, and Alchemist.

> **2. Current and Former Officers and Directors of SHRG, Oblon, Brock and Thatch, as well as Bollinger and CTH, Schemed to Orchestrate a Fraudulent Transfer of Plaintiffs' FOG Investments to CTH, and Eventually to SHRG and/or Alchemist in Violation of the Securities Laws – The CTH Stock-Fraud Schemes and the Cover-Up of the Promissory Note-Fraud Schemes.**

72.     In February 2018, Plaintiffs (through Mr. Eddy) were introduced to Thatch by Oblon.  This introduction was made following Plaintiffs repeated requests for the status of the "plan" Oblon outlined to them regarding the repayment of their investments and securing their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the

Note Purchase Agreement.  In order to assuage Plaintiffs' concerns that they would not maintain their ownership and equity interests, Thatch reached out to Mr. Eddy on February 19, 2018 *via* text message.  In a subsequent phone conference with Thatch the following day, Mr. Eddy explained that he was concerned about certain possible irregularities in the Plaintiffs' FOG investments.  Thatch falsely indicated that there were no irregularities with the FOG investments. This representation was false and Thatch either knew it was false at the time the representation was made, or made the false representation without regard to its truth or falsity.  Thatch also failed to correct these false representations once he learned they were false.  Plaintiffs relied on Thatch's representations and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct.  But for Thatch's representation, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.  In advance of the February 20 call, it was clear that Oblon had transmitted the Plaintiffs' Note Purchase Agreements with FOG to Thatch and that Thatch was aware of those agreements.

73.     Thatch then referred Plaintiffs (again, through Mr. Eddy) to Brock.  On or about March 20, 2018, Mr. Eddy spoke with Brock over the telephone.  Mr. Eddy once again explained that he was concerned about certain possible irregularities in the Plaintiffs' FOG investments.  On this call Brock falsely indicated that there were no irregularities with the FOG investments, but that he, Oblon, Thatch and Bollinger had a "plan" to get Plaintiffs their ownership and equity interests in FOG converted into stock in Oblon's "new company," which is generally referred to herein as the "CTH Stock-fraud scheme."  These representations were false and Brock either knew they were false at the time the representations were made, or made the false representations without

regard to their truth or falsity.  Plaintiffs relied on Brock's representations and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-fraud scheme.  But for Brock's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

74.     On or about March 21, 2018, Brock first indicated to Plaintiffs (through Mr. Eddy) that Oblon's "new company" was SHRG (*i.e.*, SSI, SHRG's predecessor in interest).

75.     On or about April 5, 2018, Brock indicated to Plaintiffs (through Mr. Eddy) that he, Oblon, Thatch and Bollinger were "working on the value of the vehicle to make this happen," which Mr. Eddy (and Plaintiffs) understood to be SSI (now SHRG) based on Brock's representations.  These representations were false and Brock either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Brock's representations and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-fraud scheme.  But for Brock's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

76.     On or about June 6, 2018, Defendants SHRG, FOG, Oblon, Brock, and Thatch furthered their fraudulent scheme on a phone conference attended by Plaintiffs, Brock, and Bollinger.  During this call, Brock explained that Oblon was too busy to handle the Plaintiffs'

investment and equity issues and that Oblon had turned that task over to Brock and Bollinger. Brock and Bollinger were proceeding at Oblon's direction and with his full knowledge and, upon information and belief, Thatch's full knowledge.

77.     During this call Brock made it clear that the Defendants understood that Plaintiffs were very unique from all of the other FOG investors, in that Plaintiffs' last minute investments "saved" FOG, and what Plaintiffs were offered, including the 5% equity membership for each of the Plaintiffs (plus the additional 7% equity to be shared equally among Plaintiffs) was different from any other investor.  Brock and Bollinger also made clear that it was only as a result of Plaintiffs' last-minute investments into FOG that the company was able to survive and could be acquired by, at the time, SSI.  Moreover, SHRG has publicly represented that Oblon "has been, in large part, the catalyst of the opportunities that have been established with Sharing Services, Inc. since the acquisition of the controlling interest", in that he had "recently brought his established Four Oceans Global company and its subsidiary platforms into Sharing Services. . ."[13]

78.     Bollinger then explained the details of his, Oblon's, Brock's, and Thatch's "plan" and falsely represented to Plaintiffs that FOG had been dissolved, but that Plaintiffs would get stock in Oblon's new company SHRG.  Bollinger then explained that Defendants could not directly give Plaintiffs shares in SHRG, but that a go-between company would need to be used so as not to raise any concerns with the SEC.  It was further explained by Bollinger that in order for Plaintiffs to ever recover their initial investment and to preserve their ownership and equity interests in FOG, Plaintiffs would have to transfer and assign their interests in FOG to CTH.  These representations were false and Brock and Bollinger either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs

---

[13] *See* Exhibit E.

relied on Brock's and Bollinger's representations and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-fraud scheme.  But for Brock's and Bollinger's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

79.    As a result of the Defendants' "plan," Plaintiffs entered into the Subscription Agreements wherein Plaintiffs acquired CTH stock securities in unregistered transactions.[14]  As a result of Oblon's fraud, and pursuant to the fraudulent schemes alleged herein, Plaintiffs each invested $33,333.00 in FOG on or about September 10, 2015, and purchased the FOG promissory-note securities in unregistered transactions in which CTH, as part of the CTH Stock-Fraud scheme was to convert Plaintiffs' investments in FOG into over one-million shares of CTH for each of them.  Plaintiff Eddy's Subscription Agreement is attached hereto as Exhibit I (Eddy).[15]  None of Plaintiffs ever received stock certificates from CTH.  Brock and/or Bollinger held out that CTH was ultimately owned by either Brock, Bollinger, and/or Oblon, but would soon be acquired by SHRG.

---

[14] It is unknown how much total capital was raised from all investors in connection with the CTH stock securities, but, upon information and belief, and according to SEC filings, there were twenty-eight (28) investors in CTH, five (5) of which were un-accredited investors.
[15] Plaintiffs Burback and Andersen executed CTH Subscription Agreements *via* DocuSign on or about June 7, 2018, with the identical (or nearly identical) terms and conditions and CTH share amounts as Plaintiff Eddy's executed Subscription agreement.  Like Plaintiff Eddy, Plaintiffs Burback and Andersen each tendered $583.33 to CTH by depositing this amount in a Wells Fargo bank account for the CTH shares.

80.     Prior to Plaintiffs' execution of the Subscription Agreements, Defendants Brock and Bollinger made clear to Plaintiffs that they had foreknowledge of a pending acquisition of CTH by SHRG.  Brock and Bollinger explained that acquisition of CTH by SHRG was not public knowledge, and that Plaintiffs were not supposed to know this.  It was further explained to Plaintiffs, who were unsophisticated investors and who Defendants Oblon, Brock and Bollinger knew to be unsophisticated investors, that this was the only way to preserve their investment and equity ownership interests in FOG, but that the Defendants would be in violation of SEC rules.  Moreover, and in furtherance of Defendants' scheme, prior to execution of the Subscription Agreements, Plaintiffs were instructed by Brock or Bollinger, and also by Oblon, to indicate they were "accredited" investors as part of the Subscription Agreements. Brock and Bollinger further instructed Plaintiffs to not buy any stock in SHRG and tell no one of the pending acquisition of CTH.  Defendants Brock and Bollinger explained that once SHRG acquired CTH, the Plaintiffs' stock in CTH would be converted to SHRG stock and that after a designated holding period Plaintiffs would have the option of selling a portion of SHRG stock to recoup their original investment while maintaining a SHRG share-value commensurate with their ownership and equity interests in FOG.  These representations were false and Brock and Bollinger either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Brock's and Bollinger's representations and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-Fraud scheme.  But for Brock's and Bollinger's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and

secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

81.     During the call, Bollinger told Plaintiffs that Oblon could not be officially involved with this "plan" (though Oblon knew what the plan was) considering that Oblon was the Chairman of the Board for SSI and could not be involved with Plaintiffs' "knowledge" of their proposed purchase of shares through the go-between company.

82.     Defendants Brock and Bollinger stated that there were "a few legal loopholes they would need to jump through, but it would happen in the next few months."  These representations were false and Brock and Bollinger either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Brock's and Bollinger's representations and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-Fraud scheme.  But for Brock's and Bollinger's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.  They also made it very clear that Plaintiffs were not to buy any shares in SHRG in the coming months or that would be considered insider trading, since SHRG's value would go up with the acquisition of CTH.

83.     Even though Oblon could not be officially involved with the CTH Stock-Fraud scheme, Brock and Bollinger made it clear that this "plan" was happening with Oblon's full knowledge, faith and acceptance to make Plaintiffs' whole, pay back their original investment in FOG with interest, and allow them to proceed with their ownership and equity interests preserved

- 26 -

in FOG albeit through SHRG *via* conversion of CTH shares to SHRG shares after CTH was acquired.

84.     As part of their ongoing fraudulent conduct, Defendants Oblon, Brock, Thatch and Bollinger continued with their scheme whereby they could secure additional funds from Plaintiffs under the guise that their investments in FOG were not only protected, but remained lucrative by virtue of an anticipated purchase of CTH by SHRG.

85.     On or about July 26, 2018, and unbeknownst to Plaintiffs, Brock falsely represented to Plaintiffs (through Mr. Burback) that SHRG was in the process of acquiring CTH and that the shares of CTH would soon be converted to shares in SHRG.  Defendants Oblon, Brock and Bollinger assured Plaintiffs that their investments in FOG would be secured and protected by this contemplated transaction and would be even more lucrative by virtue of the anticipated purchase of CTH by SHRG, which was on the verge of closing.  These representations were false and Oblon, Brock and Bollinger either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Brock's representations and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-Fraud scheme.  But for Brock's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

86.     During this call, Brock indicated that a settlement and release agreement would need to be executed in favor of FOG, and that the agreement would reflect the number of shares Plaintiffs would receive from CTH that would ultimately be converted to SHRG shares.

87.     On or about July 20, 2018, Defendants sought to procure settlement and release agreements from the Plaintiffs as part of their fraudulent schemes.  Agreements (with identical or nearly identical terms) were sent to the Plaintiffs, which were executed by each of the Plaintiffs, but were **never** executed by Oblon, who held himself out as the President of FOG in the agreements.  Plaintiff Eddy's proposed settlement and release agreements is attached hereto as Exhibit J.[16]  When Plaintiffs sought out copies of the exhibit B to the Settlement Agreements, which is purportedly a conversion agreement and/or debt assumption agreement, Defendants refused to provide them to Plaintiff's.

88.     None of the proposed settlement and release agreements were executed on FOG's behalf by Oblon, FOG's purported manager, but they were executed on behalf of CTH by Bollinger, CTH's purported President.

89.     To the extent the proposed settlement agreements were ever fully executed by Oblon, which they were not, none of the Plaintiffs' relinquished their right in and to their respective equity ownership interests in FOG (or the other consideration subject of the Note Purchase Agreements) pursuant to the express terms of the proposed settlement and release agreements.

90.     On or about June 1, 2019, Plaintiffs held a conference call with Brock.  It was on this call that Brock told Plaintiffs that the deal for SHRG to purchase CTH was not going to happen and that because FOG was dissolved, and the "plan" they made to attempt to compensate Plaintiffs had fallen through, they were simply out of luck and that their investment, commissions, and their ownership and equity interests were lost.  These representations were false and Brock either knew they were false at the time the representation were made, or made the false representations without

---

[16] Plaintiffs Burback and Andersen executed proposed settlement and release agreements on or about July 20, 2018, with the identical (or nearly identical) terms and conditions set out in Exhibit J.

regard to their truth or falsity.  Plaintiffs relied on Brock's representations and in reliance, Plaintiffs were put off the trail of and Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-Fraud scheme.  But for Brock's representations, Plaintiffs would have investigated further in order to seek to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

91.    Defendant Brock further stated to Plaintiffs that he believed that Oblon had simply decided not to compensate them, and that there was nothing else for them to do, or could do.  It was clear to Plaintiffs on this call that their investments and ownership and equity interests in FOG were gone.

92.    None of Defendants Oblon, Brock, Thatch, Bollinger, SHRG, FOG, FOHI, Alchemist, or CTH ever informed Plaintiffs that the proposed CTH transaction and subsequent acquisition by SHRG was merely a ruse, fraudulent and unlawful from its inception, and that CTH had no valid purpose other than as an artifice of their fraud to perpetuate the CTH Stock-Fraud scheme and to conceal the Promissory Note-Fraud scheme.  These defendants had a duty to disclose these facts because they knew that Oblon, Brock, Bollinger and/or Thatch:  (1) owed a fiduciary duty to Plaintiffs (as members of FOG); (2) made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that made earlier representations to Plaintiffs untrue or misleading.  Plaintiffs relied on their silence/omissions and in reliance, had these defendants not remained silent, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their

investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

> ### 3. SHRG, Oblon, Brock and Thatch, as well as Bollinger and CTH, Continued Their Fraud as Part of the CTH Stock-Fraud Schemes in an effort to Cover-Up the Promissory Note-fraud Schemes.

93.     In October of 2019, at least Defendants SHRG, Oblon, Brock and Thatch, as well as Bollinger, CTH and Alchemist, continued with their efforts to fraudulently deceive Plaintiffs with respect to their investments and equity interests in FOG and further perpetuated the CTH Stock-Fraud schemes to conceal the Promissory Note-Fraud schemes.

94.     On October 10, 2019, without prompting from Plaintiffs and despite Brock's representations on June 1, 2019, Bollinger, for the second time, transmitted  proposed settlement and release agreements (with identical or nearly identical terms) to Plaintiffs Burback, Eddy and Andersen, respectively, *via* email.[17]  Bollinger's email stated as follows:

> I took forever, but it finally appears to be moving forward!

> Please sign and scan email the form back to me.  This form has been signed by Robert Oblon and myself.  I will be working with the attorney on the final step of merging CTH into Alchemist Holdings (which is where the shares of SHRG are held).

> There will be an interim step of converting the old debt into shares of CTH, Inc which will be completed once everyone has signed the documents.

> I will keep you updated on the progress.

Exhibit K.

---

[17] *See* Exhibit K, October 10, 2019, email from Bollinger to Plaintiff Eddy with attached second proposed settlement and release agreement executed by Bollinger, as president of CTH and Oblon, as president of FOG.  Plaintiffs Burback and Andersen received identical (or nearly identical) emails with an identical (or nearly identical) second proposed settlement and release agreement from Bollinger on or about October 10, 2019.

95.    These representations were false and Bollinger either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.

96.    In the second proposed settlement and release agreements, Oblon, once again, held himself out as the President of FOG by virtue of his execution of the agreements, with Bollinger holding himself out as the President of CTH.  Bollinger, for himself and acting at the behest of others, failed to indicate that these agreements were not the same as the prior settlement agreements sent to Plaintiffs and failed to indicate that they had been materially altered, with the change of one word, that effectively rendered the proposed settlement agreement meaningless.  Bollinger and Oblon had a duty to disclose this because they knew that: (1) at least Oblon owed a fiduciary duty to Plaintiffs (as members of FOG); (2) they had made partial disclosures that created a false impression to Plaintiffs; (3) they had voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) they had discovered new information that made earlier representations to Plaintiffs untrue or misleading.   None of the Plaintiffs executed these agreements and never responded to Bollinger.

97.    In July of 2020, once again without prompting from Plaintiffs and despite Brock's representations on June 1, 2019 and other representations by Bollinger and Oblon as alleged herein, Bollinger again reached out to Plaintiffs and stated:

> I was able to finally get Robert Oblon's signature on the settlement and release agreements, as well as the Contribution and exchange agreement. As you all know, one of the risks that we faced was that Mr. Oblon would tell us to pound sand...which is exactly what he did for well over a year.  I am not sure where the change of heart came from, but ultimately, he did the right, and legal thing... It was my understanding that the shares currently held by Alchemist would be set aside for the benefit of CTH shareholders, and I have been patiently waiting to get confirmation of such actions.

> Over the last few weeks, I was made aware that Mr. Oblon left Alchemist Holdings and is no longer a stake holder in said entity.  I engaged the attorney helping us, to reach out to the new president and decision maker, and had a conversation just a few days ago.  Unfortunately,  the conversation was a bit disappointing, and not what I expected, but I am hopeful that given time to review the documents, we will finally complete this long-awaited transaction without further legal remedies.

*See* Exhibit L, July 9, 2020, email from Bollinger to Plaintiff Eddy.  Plaintiffs Burback and Andersen received identical (or nearly identical) emails from Bollinger on or about July 9, 2020.

98.     The representations set out in the July 9, 2020 email were false and Bollinger either knew they were false at the time the representation were made, or made the false representations without regard to their truth or falsity.

99.     Defendants Oblon, FOG, Bollinger, Does 1-5 and, upon information and belief, Defendants SHRG, Alchemist, Brock and Thatch were aware of (by actual or constructive knowledge) and/or authorized the October 2019 and July 2020 Bollinger communications to further perpetrate the fraudulent CTH-Stock-fraud schemes against Plaintiffs.  As a result, these defendants had a duty to disclose the true facts because they knew that at least Bollinger: (1) made partial disclosures that created a false impression to Plaintiffs; (2) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (3) discovered new information that made earlier representations to Plaintiffs untrue or misleading.

100.     None of Defendants Oblon, Brock, Thatch, Bollinger, SHRG, FOG, FOHI, Alchemist, or CTH ever informed Plaintiffs that the proposed settlement agreements were part of the CTH Stock-Fraud scheme and were not legitimate transactional documents to further the stated purpose of the CTH transaction as stated by Defendants (*i.e.*, to allow for the Plaintiffs to recover their investments and ownership interests in FOG, among other things), but rather were fraudulent and unlawful efforts with no valid purpose other than as an additional artifice of their fraud to perpetuate the CTH Stock-Fraud scheme and to conceal the Promissory Note-Fraud scheme.  As

a result, these defendants had a duty to disclose the true facts because they knew that at least Bollinger: (1) made partial disclosures that created a false impression to Plaintiffs; (2) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (3) discovered new information that made earlier representations to Plaintiffs untrue or misleading.

**D.    *Current and Former Officers and Directors of SHRG, Oblon's, Brock's, and Thatch's, as well as Bollinger's, Fraud Was Discovered, Acknowledged, Accepted and/or Ratified and Covered-up by SHRG.***

101.    Plaintiffs have only recently learned of Defendants fraudulent acts alleged herein. Plaintiffs learned that fraudulent acts of Oblon and, presumably Brock, were recently publicly exposed by SHRG in SEC filings.  However, despite their public representations otherwise, and as alleged herein, SHRG had knowledge of the fraudulent acts and the fraudulent schemes alleged herein, through actual and/or constructive knowledge, as a result of the positions of Oblon, Brock, and Thatch as officers, directors, agents, and/or advisors of SHRG.  As a result, SHRG is on notice of these fraudulent acts and, as it has publicly acknowledged, is jointly and severally liable for the acts complained of herein.  Moreover, SHRG never disclosed the fraudulent acts and the fraudulent schemes alleged herein to the SEC and, by extension, the investing public.

102.    Plaintiffs first believed that the fraudulent acts complained of herein occurred when it learned from SHRG's recently submitted Form 10-Q filed with the Securities and Exchange Commission on December 16, 2019, for the period ending October 31, 2019.  For example, in SHRG's 10-Q, the company reported the following to the public:

(a) In January 2019, ***the Company became aware of an unliquidated amount of potential liability arising from a series of cash advance loan transactions ("Transactions") entered into by eight different lending sources and a Related Party entity ("debtor entity") owned and/or controlled by a former Company officer.***  [Upon information and belief, Plaintiffs believe that this former Company officer is either Defendant Oblon or Defendant Brock.].  Without the knowledge of the Company and in contravention of the express provisions of both the Company's Bylaws and the controlling Nevada Revised

Statutes, this former officer also purported to obligate the Company (and two of the Company's affiliates) to repay the amounts owed by the debtor entities under the Transactions. At this time, the Company has resolved all of the debt associated with the Transactions at a substantial discount from the amounts alleged by the holders of such debt. Additionally, the Company has entered into a comprehensive agreement, secured by substantial assets, with the former officer and the entity owned and/or controlled by the former officer. Pursuant to such agreement, the former officer and the entity owned and controlled by such former officer are obligated jointly and severally to repay the Company all sums expended by the Company in the resolution of the Transactions. The amount expended by the Company, in connection with such resolution, is the sum of $3.4 million. At April 30, 2019, the Company has recorded an accounts receivable of $3.4 million from the former officer and the entity owned and/or controlled by the former officer. This amount is reported in accounts receivable, related party in our consolidated balance sheet.

(b) In February 2019, Oblon resigned as a member of the SHRG Board and relinquished his position as Chairman, although he purports to remain as the CEO of Elepreneurs.

(c) In approximately March 2019, Jordan Brock was no longer an officer with SHRG and entered into a consultancy agreement with SHRG.

(d) In June 2019 SHRG found out about: "potential liability arising out of certain previous transactions involving the formation and capitalization of two legal entities affiliated with a Company consultant who was, at the time, considered the Company spokesperson. [Upon information and belief, Plaintiffs believe this individual refers to Defendant Oblon.]. *Without the knowledge of the Company and in contravention of the express provisions of both the Company's Bylaws and the controlling Nevada Revised Statutes, this Company consultant purportedly solicited investment funds from various persons, who at the time, were independent contractors of the Company*. . . Upon learning of these allegations from various of these investors, the Company launched an immediate internal investigation into these transactions. In addition, the Company secured the services of a Dallas-based law firm with experience in financial impropriety and forensic investigations to assist in that process. *The Company believes that it is probable that these actions have resulted in a material loss to the investing parties and is evaluating the potential exposure of these events to the Company. The Company is continuing to finalize its evaluation and to pursue settlements with the impacted investing parties.*" (emphasis added).

(e) In July 2019, Oblon and SHRG entered into a settlement agreement whereby SHRG would pay Oblon $2,200,000, in exchange he would give up certain intellectual property rights, entered into a non-compete, among other things.

- 34 -

Notably, ***Oblon conceded in the settlement agreement that he engaged in ultra vires acts and self-dealing***.  (emphasis added).

(f)   In August 30, 2019, SHRG (and other related-corporate entities) sued Oblon for breaching the settlement agreement.  *Sharing Services Global Corporation f/k/a Sharing Services, Inc., et al. v. Robert Oblon*, Cause No. 366-04941-2019, in the 366th District Court of Collin County.

(g)   On August 12, 2019, Oblon sued Brock in connection with the ownership and control of Alchemist, among other things.  *Robert Oblon v. Jordan Brock*, Cause No. 19-7298-367, in the 367th District Court of Denton County, Texas.

(h)   For the three months ended October 31, 2019, our consolidated non-operating expenses include litigation settlements and other non-operating expenses of $4.0 million, including an estimated loss of $2.9 million from the settlement of certain legal claims and counterclaims between the Company and certain of its affiliated entities, and Company founder and former consultant, Robert Oblon, a loss of $425,000 in connection with the Release and Settlement Agreement by and between the Company and 212 Technologies and a loss of $317,105 on impairment of a promissory note receivable.

Exhibit M, SHRG's Form 10-Q filed December 16, 2019, at 19-20.

103.   Upon information and belief, these public disclosures are related to the same or similar fraudulent actions complained of herein that were directed to other investors but, at a minimum, they clearly establish that fraud did in fact occur within the confines of SHRG by the relevant actors, including Oblon and Brock, and thus put Plaintiffs onto the trail of investigation into the fraudulent actions and fraudulent schemes alleged herein.

**E.**   ***Bollinger Attempts to Distance Himself From His Conduct and Bolsters Plaintiffs' Allegations Against Oblon, Brock, Alchemist, and SHRG.***

104.   Upon information and belief, prior to the filing of this lawsuit, Bollinger had knowledge that this lawsuit may be filed naming him as a defendant.  Upon information and belief, Bollinger, despite engaging in the conduct alleged herein as a principal actor, as well as a co-conspirator, sought to distance himself from the other named defendants.

- 35 -

105.    On or about December 8, 2020, without prompting from Plaintiffs, , Bollinger again

reached out to Plaintiffs and stated:

Hello everyone,

Sorry for the long delay in getting back to everyone.  We have been hopeful that
Mr. Brock and his attorney's would have responded earlier to work this out without
having to resort to a final demand letter.  Unfortunately, we had to hire an attorney
as well as spend the time doing something that should have been very easily solved.

I want to make perfectly clear that I am hopeful that Mr. Brock will make the right
decision, and have always thought this would be worked out.  It appears that the
bad blood between Mr. Oblon and Mr. Brock is clouding his judgement, and I can
certainly understand his position…However, Mr. Brock has promised me, and this
group, that he would get this done, and make this right.

At this point we can wait no longer.  I have attached a copy of the demand letter
that was delivered yesterday to Mr. Brock and his attorney's.  You will notice that
there is a 10 day period to cure this dispute.  The intention is to have the regulatory
bodies look into this matter should they continue to stay silent.  This will create a
whirlwind of trouble for Mr. Oblon and Mr. Brock and unfortunately slow down
the process of us getting our rightful shares.

I understand everyone's frustration with this long process, and desire for it to be
made right.  Should anyone disagree with our strategy, please feel free to reach out
to me with your thoughts.  I want to make sure everyone is heard in the event we
need to take these drastic steps.

Regards,

Jeff.

*See* Exhibit N, December 8, 2020, email from Bollinger to Plaintiff Eddy attaching a demand letter
to Defendant Brock and his purported counsel.  Plaintiffs Burback and Andersen received identical
(or nearly identical) emails (and demand letters) from Bollinger on or about December 8, 2020.

106.    Bollinger's December 8, 2020, attached a demand letter from his counsel to

Defendant Brock and his purported counsel, demanding, among other things, that 10.5 million

shares of SHRG stock be delivered to CTH that are being held by Alchemist. *Id*.  While trying to

distance himself from the conduct alleged herein, Bollinger corroborates many of Plaintiffs'

allegations, as well as identifies additional potential causes of action that were unknown to

- 36 -

Plaintiffs against, at least, Oblon, Brock, and/or SHRG, for "unlawfully fail[ing to] list all of the pivot entities and investors [preceding SHRG] in violation of Section 13(a) of the Securities Exchange Act of 1934, and Rules 13a-11 and 12b-20 promulgated thereunder", as well as RICO violations involving a pattern of racketeering activity within the meaning of 18 U.S.C. §§196(1), 1961(5) and 1962(c), and through multiple instances of Mail Fraud and Wire Fraud, in violation of 18 U.S.C. §§ 1341 and 1343." *Id.*

**F.**     ***Oblon, Brock, Thatch, and Bollinger Had Actual and Apparent Authority for the Corporate Defendants and Used Their Authority to Cover-up the CTH Stock-Fraud Scheme and the Promissory Note-Fraud Scheme on Behalf of the Corporate Defendants.***

107.     Based on the positions and titles held by Defendants Oblon, Brock, Thatch, and Bollinger, at all times, each of Alchemist, FOG, FOHI, Elepreneurs, Elevacity, SHRG and CTH had actual knowledge of the unlawful and fraudulent actions and fraudulent schemes alleged herein.  Further, based on their positions and titles at SHRG, Defendants Oblon, Brock and Thatch, at all times had actual authority or, at a minimum, apparent authority, to represent the interests of Alchemist, FOG, FOHI, Elepreneurs, Elevacity, and SHRG, which had actual knowledge or, at a minimum, constructive knowledge, of the unlawful and fraudulent actions and fraudulent schemes alleged herein.  Accordingly, the corporate Defendants are jointly and severally liable for the actions of their officers, directors, agents and advisors, including Defendants Oblon, Brock, Thatch and Bollinger.

**G.**     ***Discovery Rule – Fraudulent Concealment – Blameless Ignorance***

108.     Plaintiffs were unaware of the conduct described herein until recently. Accordingly, and to the extent necessary, Plaintiffs plead the discovery rule based on Defendants' fraud or, at a minimum, negligent misrepresentations, because the information needed to discover whether Plaintiffs had suffered any harm from Defendants' fraudulent conduct and the fraudulent

schemes alleged herein, has been under the sole control of Defendants. Reasonable diligence could not have uncovered the true facts that were not partially disclosed until as recently as December 2019.  Thus, the harm to Plaintiffs was inherently undiscoverable.

109.    In addition, to the extent necessary, Plaintiffs pleads fraudulent concealment.  All Defendants had actual knowledge of, or at a minimum, constructive knowledge of, the fraudulent acts and schemes as alleged herein.  Likewise, all Defendants had actual knowledge, or at a minimum constructive knowledge, of the overall scheme to commit frauds against Plaintiffs by misrepresenting material facts and/or remaining silent when having a duty to speak. Each Defendant used deception to carry out this scheme and keep it from Plaintiffs. Defendants misrepresented information or purposely remained silent about the overall schemes to commit fraud against Plaintiffs.  Defendants' purpose was simply to avoid paying Plaintiffs what they were entitled and divest them of their investments and ownership and profit interests in FOG.  Plaintiffs reasonably relied upon the representations made by the Defendants (including their silence) during the time the schemes alleged herein were undertaken.

110.    Defendants took affirmative acts to conceal the facts forming the basis of these allegations from Plaintiffs (and the public), which prevented Plaintiffs from gaining knowledge of those facts, thus rendering it impossible for Plaintiffs to gain knowledge of those facts. Defendants failed to disclose facts that it was obligated to disclose to Plaintiffs and there was no way for Plaintiffs to have known that Defendants were engaged in and were continuing to engage in the acts and omissions alleged herein giving rise to Plaintiffs' claims and causes of action and the harm they have suffered.

111.    Plaintiffs were unaware of Defendants' true intentions with respect to Plaintiffs. Thus, Plaintiffs were blamelessly ignorant of any injury, potential causes of action, or actual causes

of action stemming therefrom. Plaintiffs failure to discover the breaches as alleged herein were directly attributable to Defendants' efforts to fraudulently conceal their true intentions with respect to Plaintiffs.  It was not until December 16, 2019, at the earliest, that there was any indication to lead Plaintiffs to understand or identify the extensive fraud engaged in by Defendants or any of the conduct complained of herein. Plaintiffs' failure to discover the facts giving rise to the allegations and causes of action herein was a result of its blameless ignorance. Even if Defendants did not fraudulently conceal the conduct complained of herein (which Plaintiffs believes they did), Plaintiffs reasonably relied on Defendants to act in good faith.

### H.    *Alter Ego Allegations*

112.    Upon information and belief, Defendants Oblon, Brock, Thatch, and/or Alchemist dominated and controlled SHRG, Elepreneurs, Elevacity, FOG and FOHI, and their business, property and affairs, and that there existed, and now exists, such a unity of ownership and interest between the individuals and entities, that the individuality and separate existence of these individuals and the entities cease to exist.   These individuals and entities are in fact a mere instrumentality or alter ego of one another, including SHRG, or, in the case of Alchemist, the largest shareholder of SHRG.

113.    Thus, adherence to the separate existence of these individual and corporate defendants would promote injustice, unfairness and/or sanction fraud in that the corporate defendants were undercapitalized and a mere shell, conduit and instrumentality through which these individual defendants carried on their business as if this did not exist.

114.    SHRG, FOG, FOHI, Elepreneurs, Elevacity, Alchemist and CTH operated as a single economic entity such that it would be inequitable to uphold a legal distinction between them. These corporate defendants were not adequately capitalized for the undertaking, nor was, at least,

FOG, FOHI, Alchemist and CTH solvent.  Upon information and belief, the corporate formalities were not observed by and among SHRG, FOG, FOHI, Elepreneurs, Elevacity, Alchemist and CTH.  Further, the dominant shareholder, here Alchemist and its controlling (though disputed) owners/members, siphoned SHRG funds, assets and shares to the detriment of Plaintiffs. Moreover, SHRG, FOG, FOHI, and CTH simply functioned as a facade for the dominant shareholder, Alchemist.

115.    Upon information and belief, the following facts further support alter ego liability of Defendants SHRG, FOG, FOHI, Elepreneurs, Elevacity, CTH, and Alchemist:  Defendants failed to, at a minimum, (a) properly issue stock, (b) using corporate officers, directors, agents and affiliated entities as a subterfuge of illegal transactions, commingling personal and corporate assets, and undercapitalization, (c) diverted corporate funds to non-corporate uses, (d) diverted corporate funds for unlawful uses, and, (e) disregarded corporate formalities and failed to maintain adequate corporate records, among other things.

116.    Upon information and belief, Defendants Oblon, Brock, Thatch, CTH, Bollinger, Alchemist and/or SHRG dominated and controlled SHRG, FOG, FOHI, Elepreneurs, Elevacity, and their businesses, property and affairs, and that there existed and now exists, such a unity of ownership and interest between the individuals and entities that the individuality and separate existence of these individuals and entities cease to exist.

**VI.**
**CAUSES OF ACTION**

**COUNT 1:** **FRAUD – VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT, 15 U.S.C. § 78j(b), AND SEC RULE 10b-5, 17 C.F.R. § 240.10b-5 – AS TO DEFENDANTS OBLON, BROCK, FOG, FOHI, ELEPRENEURS, ELEVACITY, AND DOES 1-5 FOR PROMISSORY NOTE-FRAUD SCHEMES.**

117.    Plaintiffs incorporate the facts and allegations set forth above.

118.    Securities and Exchange Commission Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a)    To employ any device, scheme, or artifice to defraud,

(b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

119.    The sale and offer of sale of the promissory notes attendant to the Note Purchase Agreements, inclusive of the equity and ownership interests in FOG and other benefits to Plaintiffs contained therein, were in connection with and constitute the sale of securities.

120.    In connection with the sale and offer of sale of the promissory notes attendant to the Note Purchase Agreements, inclusive of the equity interests in FOG and other benefits to Plaintiffs contained therein, Defendants Oblon, Brock, FOG, FOHI, and, upon information and

belief, Does 1-5, have engaged in activities that affect interstate commerce. Their schemes, as alleged herein, have operated within the United States.   Federal securities laws regulate Defendants' actions and this Court has jurisdiction to apply Section 10b-5 with respect to all activities alleged and described herein.

### Rule 10b-5, Subsections (a) and (c) Scheme Liability

121.    Securities and Exchange Commission Rule 10b-5, subsections (a) and (c), make it illegal "to employ any device, scheme, or artifice to defraud" and "to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."   Defendants Oblon, Brock, FOG, FOHI, Elepreneurs, Elevacity, and, upon information and belief, Does 1-5, are liable under Subsections (a) and (c) of Rule 10b-5 as follows:

(a)      With respect to the Plaintiffs' with purchase of the FOG promissory note securities attendant to the Note Purchase Agreements, inclusive of the equity interests in FOG and other benefits to Plaintiffs contained therein, Defendants Oblon, Brock, FOG, FOHI, Elepreneurs, Elevacity, and, upon information and belief, Does 1-5, employed a plan, scheme, and course of business to operate as a fraudulent enterprise to induce Plaintiffs' purchase of the promissory notes with no intention of returning their investments, interest thereon, or remunerating them with the additional consideration they bargained for, including their equity ownership interests in FOG, among other things. Defendants Oblon and FOG (by and through Oblon) offered each Plaintiff identical (or nearly identical) terms and conditions, policies and procedures, compensation and equity ownership in FOG as the offering materials for their investment.   In fact, their respective Note Purchase Agreements referred to one another as part of a unified series of investments

in FOG. The Promissory Note-fraud scheme had as its defined target unsophisticated investors like Plaintiffs, among others similarly situated and currently unknown to Plaintiffs.  The scheme went beyond the material and fraudulent misrepresentations (and omissions) of Defendant Oblon (made in both his individual capacity, as well as on behalf of FOG, Elepreneurs, Elevacity, and FOG's successor in interest (whether by name change, consolidation, merger, or otherwise) FOHI; it was designed to act and did in fact operate as a scheme to deprive Plaintiffs of their investment so that these defendants could, upon information and belief, enrich themselves to the detriment of Plaintiffs to obtain personal gains and cover personal living expenses, among other things, as well as, upon information and belief, Ponzi payments to other similarly situated investors in FOG (or other failed Oblon ventures) to keep the scheme afloat.  This spending of Plaintiffs' investments made it impossible for FOG to generate the promised returns on the funds invested or for Plaintiffs to receive promised bonuses or profits as equity owners in FOG.  Alternatively, Plaintiffs allege that these defendants procured Plaintiffs' investments with no intention of ever providing a return on the funds invested, interest earned thereon, or for Plaintiffs to receive promised bonuses or profits as equity owners in FOG.

(b)     The Promissory Note-Fraud scheme depended on a fiction that acted as a fraud or deceit on Plaintiffs—that FOG was a legitimate business enterprise that would generate revenues, thus allowing Plaintiffs to receive returns on the funds invested and to receive promised bonuses and profits as equity owners in FOG, and not a vehicle to steal Plaintiffs' money in order to, upon information and belief, enrich Oblon for personal gain and his personal living expenses, as well as, upon information and belief, Brock, among other things, as well as Ponzi payments to other similarly situated investors in FOG (or

other failed Oblon ventures), or to transfer FOGs assets (secretly or otherwise) to a successor entity (whether by name change, consolidation, merger or otherwise), to Elevacity, Elepreneurs, and/or FOHI, which were ultimately sold to SSI, now SHRG, leaving Plaintiffs with nothing.  In fact, Defendants Oblon, Brock, FOG, FOHI, and/or Does 1-5, knew, upon information and belief that: (a)  Plaintiffs' investments would be used for Oblon's and/or Brock's personal gain and personal use; (b) Plaintiffs' investments would not be used for legitimate business expenses for FOG and that FOG vendors, members and Plaintiffs' interest payments and other compensation would not be paid; (c) Plaintiffs investments would be used as Ponzi payments to other similarly situated investors in FOG (or other failed Oblon ventures); (d) Plaintiffs' investments were procured with no intention of ever providing a return on the funds invested, interest earned thereon, or for Plaintiffs to receive promised bonuses or profits as equity owners in FOG; and/or (e) that FOG's assets would be transferred to successor entities (whether by name change, consolidation, merger or otherwise), including Elepreneurs, Elevacity and/or FOHI prior to their acquisition by SHRG.

### Subsection 10b-5(b) Liability

122.    As alleged herein, during negotiations, which began on or about August 2015, up to the execution of Note Purchase Agreements and payment of their investment funds in September of 2015, Defendant Oblon and FOG (by and through Oblon) made numerous fraudulent misrepresentations and fraudulent, material omissions to/from Plaintiffs in furtherance of the Promissory Note-Fraud scheme to deprive Plaintiffs of their investments, interest earned thereon, bonuses, profits as equity owners in FOG, and other benefits they bargained for.

123.     Examples of the fraudulent misrepresentations made to Plaintiffs in furtherance of the Promissory Note-fraud scheme are as follows:

(a)     Prior to the execution of the Note Purchase Agreements on or about September 10, 2015, and throughout the negotiations that occurred from approximately late-July 2015 leading up to the execution of Note Purchase Agreements, Oblon represented to Plaintiffs that FOG was a legitimate business enterprise.  This representation was false and Oblon either knew it was false at the time the representation was made, or made the false representation without regard to its truth or falsity. Oblon also failed to correct these false representations after the execution of the Note Purchase Agreements. Plaintiffs relied on Oblon's representations and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  But for Oblon's representation, Plaintiffs would not have made these investments in FOG.

(b)     On or about August 30, September 1, September 2, September 8, and/or September 9, 2015,  during one or more phone calls with Plaintiffs, and prior to the Plaintiffs' execution of the Note Purchase Agreements, Oblon represented to Plaintiffs, that  Plaintiffs' investments would be utilized to pay FOG's vendors, including the vendor for the web-based portal for FOG members.  These representations were false and Oblon either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Oblon also failed to correct these false representations after the execution of the Note Purchase Agreements.  Plaintiffs relied on Oblon's representations and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat

equity" in advancing FOG's business interests and developing its assets.  But for Oblon's representation, Plaintiffs would not have made these investments in FOG.

(c)     On or about August 30, September 1, September 2, September 8, and/or September 9, 2015, during one or more phone calls with Plaintiffs, and prior to the Plaintiffs' execution of the Note Purchase Agreements, Oblon represented to Plaintiffs that Plaintiffs' investments would be used to pay FOG-member distributors, including those member distributors recruited by Plaintiffs.  These representations were false and Oblon either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Oblon also failed to correct these false representations after the execution of the Note Purchase Agreements.  Plaintiffs relied on Oblon's representations and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  But for Oblon's representation, Plaintiffs would not have made these investments in FOG.

124.    Examples of the fraudulent, material omissions withheld from Plaintiffs in furtherance of the Promissory Note-Fraud scheme are as follows:

(a)     During the negotiations that occurred from approximately late-July 2015 leading up to the execution of Note Purchase Agreements, prior to the Plaintiffs' execution of the Note Purchase Agreements, Oblon failed to disclose to Plaintiffs that Plaintiffs' investments would not be used for legitimate business purposes of FOG but that they would instead be used by Defendant Oblon and, upon information and belief, Brock and Does 1-5, to enrich themselves to the detriment of Plaintiffs in order to cover personal expenses and/or for personal gains, among other things, as well as for Ponzi payments to other

similarly situated investors in FOG (or other failed Oblon ventures) to keep the Promissory Note-scheme (and/or other Oblon schemes) afloat.  Oblon also failed to disclose this information after the execution of the Note Purchase Agreements.  Defendants Oblon and, upon information and belief, Brock and Does 1-5, had a duty to disclose these facts because they knew that Oblon: (1) owed a fiduciary duty to Plaintiffs at least after the execution of the Note Purchase Agreements; (2) made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that made his earlier representations to Plaintiffs untrue or misleading.  Plaintiffs relied on Oblon's silence/omissions and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  Had Oblon not stayed silent and disclosed the true state of affairs, Plaintiffs would not have made these investments in FOG.

(b)      During the negotiations that occurred from approximately late-July 2015 leading up to the execution of Note Purchase Agreements, prior to the Plaintiffs' execution of the Note Purchase Agreements, Oblon failed to disclose to Plaintiffs that Plaintiffs' investments would serve as a springboard for the future acquisition of FOG, or at a minimum, FOG's assets (as alleged above), as well as Elepreneurs and Elevacity, by SHRG – with an eye toward excluding Plaintiffs from their ownership interests in FOG and the proceeds resulting from the acquisitions.  Oblon also failed to disclose this information after the execution of the Note Purchase Agreements.  Defendants Oblon and, upon information and belief, Brock and Does 1-5, had a duty to disclose these facts because they

knew that Oblon: (1) owed a fiduciary duty to Plaintiffs at least after the execution of the Note Purchase Agreements; (2) made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that made his earlier representations to Plaintiffs untrue or misleading.   Plaintiffs relied on Oblon's silence/omissions and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  Had Oblon not stayed silent and disclosed the true state of affairs, Plaintiffs would not have made these investments in FOG.

(c)      During the negotiations that occurred from approximately late-July 2015 leading up to the execution of Note Purchase Agreements, prior to the Plaintiffs' execution of the Note Purchase Agreements, Oblon failed to disclose to Plaintiffs that FOG's assets, as alleged above, would be transferred (secretly or otherwise) to successor entities (whether by name change, consolidation, merger or otherwise), including Elepreneurs, Elevacity and/or FOHI – with an eye toward excluding Plaintiffs from their ownership interests in FOG and the proceeds resulting from the acquisitions by SHRG.  Oblon also failed to disclose this information after the execution of the Note Purchase Agreements.  Defendants Oblon and, upon information and belief, Brock and Does 1-5, had a duty to disclose these facts because they knew that Oblon: (1) owed a fiduciary duty to Plaintiffs at least after the execution of the Note Purchase Agreements; (2)made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that

made his earlier representations to Plaintiffs untrue or misleading.  Plaintiffs relied on Oblon's silence/omissions and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  Had Oblon not stayed silent and disclosed the true state of affairs, Plaintiffs would not have made these investments in FOG.

(d)     During the negotiations that occurred from approximately late-July 2015 leading up to the execution of Note Purchase Agreements, prior to the Plaintiffs' execution of the Note Purchase Agreements, Oblon failed to disclose to Plaintiffs that Plaintiffs' investments in FOG were nothing more than a ruse to steal their money for his benefit and the benefit of others, including the defendants named herein. Oblon also failed to disclose this information after the execution of the Note Purchase Agreements.  Defendants Oblon and, upon information and belief, Brock and Does 1-5, had a duty to disclose these facts because they knew that Oblon: (1) owed a fiduciary duty to Plaintiffs at least after the execution of the Note Purchase Agreements; (2) made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that made his earlier representations to Plaintiffs untrue or misleading.  Plaintiffs relied on Oblon's silence/omissions and in reliance, Plaintiffs executed the Note Purchase Agreements, invested their money in FOG, as well as significant time and labor in "sweat equity" in advancing FOG's business interests and developing its assets.  Had Oblon not stayed silent and disclosed the true state of affairs, Plaintiffs would not have made these investments in FOG.

125.    With respect to the Plaintiffs' purchase of the promissory notes attendant to the Note Purchase Agreements, inclusive of the equity interests in FOG and other benefits to Plaintiffs contained therein, Defendants Oblon and FOG (by and through Oblon), offered each Plaintiff the same terms and conditions, policies and procedures, compensation and equity ownership in FOG as the offering materials for their investment.  In fact, their respective Note Purchase Agreements referred to one another as part of a unified series of investments in FOG.  None of the statements (or omissions) made by these defendants, information provided by these defendants, or the materials provided to Plaintiffs by these defendants revealed that the scheme to have Plaintiffs invest in FOG was merely a ruse and that these defendants had no intention of returning the funds they invested, the interest thereon, or for Plaintiffs to receive promised bonuses, or profits as equity owners in FOG, among other things.  On the contrary, the statements (and omissions) made by these defendants and the offering materials, propagated the impression that Plaintiffs were investing in a legal and legitimate enterprise and not a Promissory Note-Fraud scheme that allowed, upon information and belief, at least Defendant Oblon and/or Brock to receive personal gains and cover personal living expenses, among other things, and to make Ponzi payments to other similarly situated investors in FOG (or other failed Oblon ventures) to keep the scheme afloat, and/or a scheme to take their investments and transfer FOG's assets, secretly or otherwise (whether by name change, consolidation, merger or otherwise), to Elepreneurs, Elevacity, and/or FOHI, which were ultimately sold to SSI, now SHRG, with no remuneration to Plaintiffs as equity owners in FOG.   Alternatively, none of the statements (or omissions) made by these defendants or offering materials informed Plaintiffs that these defendants procured their investments with no intention of ever providing a return on the funds invested, interest thereon, or for Plaintiffs to receive promised bonuses or profits as equity owners in FOG, among other things.

## Proximate Cause and Reliance

126. The loss suffered by the Plaintiffs was foreseeable and a direct result of the establishment, promotion, and expansion of the Promissory Note-fraud schemes by these defendants because the ultimate collapse of the schemes, and harm to its participants, *i.e.*, the Plaintiffs (and others similarly situated), is a direct and foreseeable consequence of the structure of the Promissory Note-fraud schemes as alleged and described herein.  There is a clear causal connection between the acts alleged herein and the injury suffered by the Plaintiffs.

127. These defendants' promotion of the legitimacy of FOG and the investment in FOG independently caused Plaintiffs to invest in FOG and not only lose money, but to also be excluded from the profits resulting from the transfer of FOG's assets (secret or otherwise) to a successor entity (whether by name change, consolidation, merger or otherwise) whether Elepreneurs, Elevacity, and/or FOHI, which were ultimately sold to SSI, now SHRG.  But for these false and misleading Promissory Note-Fraud schemes alleged and described herein, Plaintiffs would not have been induced to invest and purchase the promissory notes and equity ownership rights in FOG, among other things.  Plaintiffs' losses were a direct and proximate cause of their innocent participation in the Promissory Note-fraud schemes. Plaintiffs necessarily and/or justifiably relied on the promotion of the legitimacy of FOG and the investment in FOG to invest in the company. Such reliance may be presumed from, among other things, the presumption that no one would knowingly invest in a company knowing that its investment moneys would not be used to pay vendors or its members, as represented, but instead would be used to pay personal expenses of its manager and/or members, *i.e.*, Oblon and Brock, and/or as Ponzi payments to other investors in that company or other failed companies.  Such reliance may likewise be presumed from, among other things, the presumption that no one would knowingly invest in a company knowing that the

company's assets would be transferred to another entity (secret or otherwise, whether by name change, consolidation, merger or otherwise, that would be sold with no remuneration to equity owners in the company in which they invested.  In addition, Plaintiffs reviewed and relied upon the omissions of material facts made by Oblon and FOG (by and through Oblon) as alleged and described herein. The damages caused by the Promissory Note-Fraud scheme and/or these defendants' fraudulent misrepresentations and omissions were a necessary consequence of inherently illegal schemes to defraud Plaintiffs.

128.    Individual reliance is not an element of a scheme liability under a Rule 10b-5(a) or (c) cause of action.  Notwithstanding, in this case, generalized proof shows evidence of Plaintiffs' reliance on these defendants' material misrepresentations, omissions and schemes to defraud such as to permit a commonsense inference of reliance applicable to each of them. Here, each of the Plaintiffs signed identical or essentially identical Note Purchase Agreements (and attendant promissory notes), and agreed to identical or essentially identical terms and conditions, compensation and equity structures based on Defendant Oblon's and FOG's (by and through Oblon) material misrepresentations and omissions made to each one of them as a result of their collective negotiations with these defendants that, at times, were conducted by at least one of the plaintiffs and shared with the others.  Each Plaintiff was presented with a unified, consistent set of exaggerations, misrepresentations and omissions about their investment, how their investments would be spent, that FOG was an ongoing, legitimate business, and there was no mention that the assets of FOG would be secretly transferred to one or more entities (secret or otherwise), by name change, consolidation, merger or otherwise, which would be sold to SHRG with no remuneration as equity owners in FOG.  It is proper to infer that no reasonable person would have joined an illegal Promissory Note-Fraud scheme as alleged and described herein: rational people do not sign

up for these types of schemes and certainly do not invest in companies for other members to cover personal living expenses, among other things, or that their investments were used as Ponzi payments to other similarly situated investors, or a scheme to take their investments and transfer the company's assets (secret or otherwise) to one or more entities with the intention that that they would be sold with no remuneration as equity owners in the company in which they invested.

## Damages

129.    Plaintiffs suffered a loss of money composed of the costs paid to invest in FOG, together with the interest thereon, and their ownership interest totaling a combined 22% of FOG. Each plaintiff lost $33,333 of their initial investment and the interest thereon, their original 5% equity interest, plus the additional 2.33% equity interest given to them, in the assets of FOG, which became the assets of Elepreneurs, Elevacity, and/or FOHI (as FOG's successor in interest or by virtue of an illegal transfer of those assets between one or more of these entities) that were ultimately acquired by SSI, SHRG's predecessor in interest, as well as other consideration, including revenues from the Four Oceans Bonus Pools and other leadership bonuses.

## Scienter

130.    These defendants' actions, as set forth herein, were made with such mental state to manipulate, deceive or defraud, or with such recklessness, as to constitute *scienter*. These defendants had a motive to operate and benefit from the operation of the Promissory Note-Fraud scheme, and opportunity to conceal the fact that they were operating such a scheme.  Proof of such *scienter* can be inferred from the following:

(a)    These defendants benefitted in concrete and substantial ways from the operation of the Promissory Note-Fraud scheme.[18]  In addition to Defendants Oblon and Brock, upon information and belief, obtained personal gains from Plaintiffs' investments including the payment of personal living expenses, among other things, and, upon information and belief, made Ponzi payments to other similarly situated investors in FOG (or other failed Oblon ventures), following the transfer FOGs assets (secret or otherwise) to a successor entity (whether by name change, consolidation, merger or otherwise), Elepreneurs, Elevacity and/or FOHI, who were ultimately sold to SSI, now SHRG.  Upon the acquisition of FOHI by SHRG, which has been valued at almost $20,000,000 by SHRG, Defendant Oblon received millions of shares in SSI (converted to SHRG shares), shares in Alchemist, considerable salaries, bonuses, stock options and, ultimately, a multimillion-dollar settlement from SHRG, despite SHRG and its officers and directors (or former officers and directors), Defendants Brock and Thatch, having full knowledge of, and ultimately embracing and adopting the fraudulent conduct associated with the Promissory Note-Fraud scheme alleged and described herein, as well as other bad faith conduct, including Defendant Oblon's *ultra vires* acts while at SHRG.  SHRG now shows an operating profit of millions of dollars per year following the acquisition of FOHI.  Upon information and belief, prior to acquiring FOHI, which was derived from these defendants Promissory Note-Fraud  scheme and utilized (and still utilizes) FOG assets, SHRG lost several million dollars a year and only became profitable after the acquisition of Elepreneurs, Elevacity and FOHI, *i.e.*, FOG itself as FOHI's predecessor in interest or, at

---

[18] As alleged herein, Defendants Brock, Thatch, Alchemist, SHRG and FOHI also benefited from the Promissory Note-Fraud scheme.

a minimum, the holders of FOG's assets that were transferred to Elepreneurs, Elevacity, and/or FOHI, which are held and being utilized by SHRG or one of its subsidiaries up to this day;

(b)     These defendants engaged in plainly fraudulent and illegal behavior. *See, e.g.*, the allegations set forth in this Count 1 and the averments made in connection with the Promissory Note-fraud scheme at paras. 41 – 71, among others, which are incorporated here by reference;

(c)     These defendants had a specific understanding that each was engaged in the commission of a Promissory Note-Fraud scheme or that it would be substantially likely that the operation would be found to be an illegal Promissory Note-Fraud scheme[19]:

    i.  Defendant Oblon, who is purportedly an experienced investor and founder of numerous multilevel marketing companies, knew he was not complying with existing laws and regulations in connection with the Promissory Note-fraud schemes. Defendant Oblon made material misrepresentations and omissions to Plaintiffs regarding the Promissory Note-Fraud scheme. Defendant Oblon also knew that the Promissory Note-Fraud scheme was illegal.  Defendant Oblon therefore knew that the Plaintiffs' investments were induced in furtherance of a fraudulent scheme to deprive Plaintiffs of their investments and to exclude them from profits earned on their equity interests.  Defendant Oblon took affirmative steps by actions and omissions to disguise and/or conceal the Promissory Note-Fraud schemes from Plaintiffs.

    ii.  Defendant FOG, by and through Defendant Oblon, the founder, member, and manager of FOG, had personal knowledge of the material misrepresentations, omissions and conduct attributed to Defendant Oblon and made to Plaintiffs regarding the Promissory Note-Fraud scheme as alleged and described herein, including those allegations in the preceding subparagraph. Defendant Oblon had actual and apparent authority to act on FOG's behalf.

---

[19] As alleged herein, Defendants Brock, Thatch, Bollinger, Alchemist, SHRG, FOHI and CTH subsequently learned of and had full knowledge of the Promissory Note-Fraud scheme alleged and described herein, ultimately embraced and adopted the fraudulent conduct associated with the Promissory Note-Fraud scheme alleged and described herein, and engaged in other fraudulent acts to conceal the scheme and profit from it to their benefit and to the detriment of Plaintiffs.

iii. Defendant FOHI came to know of the Promissory Note-Fraud schemes, by and through Defendant Oblon, the founder, and upon information and belief, a current or former officer, director and shareholder, had personal knowledge of the material misrepresentations, omissions and conduct attributed to Defendant Oblon and made to Plaintiffs regarding the Promissory Note-Fraud scheme as alleged and described herein, including those allegations in the preceding subparagraphs. Defendant Oblon had actual and apparent authority to act on FOHI's behalf.

iv. Defendant Elepreneurs came to know of the Promissory Note-fraud schemes, by and through Defendant Oblon, the founder, and upon information and belief, a current or former officer, director and shareholder, had personal knowledge of the material misrepresentations, omissions and conduct attributed to Defendant Oblon and made to Plaintiffs regarding the Promissory Note-Fraud scheme as alleged and described herein, including those allegations in the preceding subparagraphs. Defendant Oblon had actual and apparent authority to act on Elepreneurs' behalf.

v. Defendant Elevacity came to know of the Promissory Note-Fraud schemes, by and through Defendant Oblon, the founder, and upon information and belief, a current or former officer, director and shareholder, had personal knowledge of the material misrepresentations, omissions and conduct attributed to Defendant Oblon and made to Plaintiffs regarding the Promissory Note-Fraud scheme as alleged and described herein, including those allegations in the preceding subparagraphs. Defendant Oblon had actual and apparent authority to act on Elevacity's behalf.

vi. Defendant Does 1-5, who are currently unknown to Plaintiffs, had personal knowledge of the material misrepresentations, omissions and conduct attributed to Defendant Oblon and made to Plaintiffs regarding the Promissory Note-Fraud scheme as alleged and described herein, including those allegations in the preceding subparagraphs, and conspired, aided and abetted and otherwise assisted with the perpetration of the Promissory Note-Fraud scheme perpetrated against Plaintiffs. Does 1-5 likely consist of one or more individuals, companies and/or their owners and/or investors, and/or their respective attorneys or agents.

131.   Plaintiffs suffered damages in that they lost moneys through their investment and purchase of the promissory notes attendant to the Note Purchase Agreements, as well as the interest

earned on their investments, and profits from their equity ownership interests in FOG, among other

benefits.

132.    Plaintiffs damages may be measured in actual damages.

**COUNT 2:    FRAUD – VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT, 15 U.S.C. § 78j(b), AND SEC RULE 10b-5, 17 C.F.R. § 240.10b-5 – AS TO ALL DEFENDANTS FOR CTH STOCK-FRAUD SCHEMES**

133.    Plaintiffs incorporate the facts and allegations set forth above.

134.    Securities and Exchange Commission Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any

means or instrumentality of interstate commerce, or of the mails or of any facility

of any national securities exchange,

(a)    To employ any device, scheme, or artifice to defraud,

(b)    To make any untrue statement of a material fact or to omit to state a material

fact necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading, or

(c)    To engage in any act, practice, or course of business which operates or

would operate as a fraud or deceit upon any person, in connection with the purchase or sale

of any security.

135.    The sale and offer of sale of stock in CTH, such as those purchased by Plaintiffs, is

in connection with and constitutes the sale of a security.

136.    In connection with the sale and offer of sale of stock in CTH, all Defendants have

engaged in activities that affect interstate commerce. Their schemes, as alleged herein, have

operated within the United States.  Federal securities laws regulate Defendants' actions and this

Court has jurisdiction to apply Section 10b-5 with respect to all activities alleged and described herein.

### Rule 10b-5, Subsections (a) and (c) Scheme Liability

137.    Securities and Exchange Commission Rule 10b-5, subsections (a) and (c), make it illegal "to employ any device, scheme, or artifice to defraud" and "to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Defendants are liable under Subsections (a) and (c) of Rule 10b-5 as follows:

(a)    With respect to the Plaintiffs' purchase of stock interests in CTH, all Defendants employed a plan, scheme, and course of business to operate as a fraudulent enterprise to induce Plaintiffs' execution of the CTH Subscription Agreement for the acquisition of worthless shares in CTH, which was predicated on what Brock and Bollinger represented as an insider trading scheme, with no intention of returning their investments in CTH or, ultimately, their investments in FOG as held out by defendants, the interest thereon, or remunerating them with the additional consideration they bargained for with FOG, including their equity ownership interests in FOG, among other things, which was the stated basis of CTH Stock-Fraud scheme. The CTH Stock-Fraud scheme had as its defined target unsophisticated investors like Plaintiffs, among others similarly situated and currently unknown to Plaintiffs.  The scheme went beyond the material and fraudulent misrepresentations (and omissions) of Defendants Oblon, Brock, Thatch and Bollinger (made in both their individual capacities, as well as on behalf of and acting with actual or apparent authority of the corporate defendants); it was designed to act and did in fact operate as a scheme to put Plaintiffs off the trail of and to fraudulently conceal the

Promissory Note-Fraud scheme, further the Promissory Note-Fraud scheme, and to ensure that Plaintiffs were deprived of their investment in CTH, and ultimately their investment in FOG, the interest thereon, and deprive them of remuneration for the additional consideration they bargained for with FOG, including their equity ownership (among other things), so that these defendants could, upon information and belief, enrich themselves to the detriment of Plaintiffs to increase the market value of FOHI prior to acquisition, increase the market value of SSI (and ultimately, SHRG prior to becoming a publicly traded company), obtain (or retain) SHRG shares to the exclusion of Plaintiffs, avoid SEC reporting requirements and disclosures of the totality of the fraudulent schemes alleged and described herein, among other things.   Plaintiffs allege that these defendants procured Plaintiffs' investments in CTH knowing that it was, as they characterized it, an insider trading scheme with no intention of ever providing a return on the funds invested in CTH, or securing Plaintiffs' investments in FOG, the interest thereon, or remunerating them with the additional consideration they bargained for with FOG, including profits from their equity ownership and bonuses in FOG, which Defendants represented was the stated purpose of their acquisition of the CTH stock.

(b)    The CTH Stock-Fraud scheme depended on a fiction that acted as a fraud or deceit on Plaintiffs—that CTH was a business enterprise, blessed by Defendants and their counsel that would  serve as a vehicle to remunerate Plaintiffs for their investments in FOG, the interest thereon, and to remunerate them with the additional consideration they bargained for with FOG, including their equity ownership and bonuses from which they were fraudulently deprived as a result of the conduct alleged herein.  The CTH Stock-Fraud scheme was implemented with the full knowledge and acquiescence of all named

defendants, both individual and corporate, and the actions and conduct complained of herein was taken in their individual capacities and their representative capacities as current or former officers, directors, managers or agents of one or more of the corporate defendants.   The CTH Stock-Fraud scheme served as a vehicle to take not only additional investment monies from the Plaintiffs, but to also cover up and to put Plaintiffs off the trail of and to fraudulently conceal the Promissory Note-Fraud scheme with which all Defendants were aware of and had full knowledge of, and to ensure that Plaintiffs were deprived of their investment investments in FOG, the interest thereon, their equity ownership and bonuses in FOG, among other things, so that these defendants could, upon information and belief, enrich themselves to the detriment of Plaintiffs to increase the market value of FOHI prior to acquisition, increase the market value of SSI (and ultimately, SHRG prior to becoming a publicly traded company), obtain (or retain) SHRG shares to the exclusion of Plaintiffs, avoid SEC reporting requirements and disclosures of the totality of the fraudulent schemes alleged and described herein, among other things.   In fact, all Defendants knew, upon information and belief that: (a)  Plaintiffs' investments in CTH would serve no useful, legitimate business or investment purpose; (d) Plaintiffs' investments in CTH were procured with no intention of ever utilizing it as a vehicle to provide a return on the funds Plaintiffs' invested in FOG, interest earned thereon, or for Plaintiffs ever to receive promised bonuses or profits as equity owners in FOG, as represented by Defendants.

### Subsection 10b-5(b) Liability

138.    As alleged herein, Defendants made numerous fraudulent misrepresentations and fraudulent, material omissions to/from Plaintiffs, and conspired with one another in furtherance of

the CTH Stock-fraud scheme to deprive Plaintiffs of their investments in CTH, but ultimately to deprive them of their investments, bonuses and profits as equity owners in FOG, and other benefits they bargained for.

139.    Examples of the fraudulent misrepresentations made to Plaintiffs in furtherance of the CTH Stock-fraud scheme are as follows:

(a)    On February 20, 2018, after having reviewed the Note Purchase Agreements and having full knowledge of the Promissory Note-fraud schemes, Defendant Thatch falsely indicated to Plaintiffs, by and through Mr. Eddy, that there were no irregularities with the Plaintiffs' investments in FOG.  This representation was false and Thatch either knew it was false at the time the representation was made, or made the false representation without regard to its truth or falsity.  Plaintiffs relied on Thatch's representation and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-fraud scheme.  But for Thatch's representation, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(b)    On March 20, 2018, and having full knowledge of the Promissory Note-fraud schemes, Defendant Brock falsely indicated to Plaintiffs (by and through Mr. Eddy) that there were no irregularities with the Plaintiffs' investments in FOG.  This representation was false and Brock either knew it was false at the time the representation was made, or made the false representation without regard to its truth or falsity.  Plaintiffs relied on Brock's representation and in reliance, Plaintiffs were put off the trail of Oblon's,

Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-fraud scheme.  But for Brock's representation, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(c)     On March 20, 2018, and having full knowledge of the Promissory Note-fraud schemes, Defendant Brock falsely indicated to Plaintiffs (by and through Mr. Eddy), that he and Defendants Oblon, Thatch and Bollinger had a "plan" to get Plaintiffs their ownership and equity interests in FOG converted into stock in Oblon's "new company." These representations were false and Brock either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Brock's representations and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-Fraud scheme.  But for Brock's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(d)     On or about April 5, 2018, and having full knowledge of the Promissory Note-fraud schemes, Brock indicated to Plaintiffs (through Mr. Eddy) that he and Defendants Oblon, Thatch and Bollinger were "working on the value of the vehicle to make this happen," which Mr. Eddy (and Plaintiffs) understood to be SSI (now SHRG) based on

Brock's representations.  This representation was false and Brock either knew it was false at the time the representation was made, or made the false representation without regard to its truth or falsity.  Plaintiffs relied on Brock's representation and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-fraud scheme.  But for Brock's representation, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(e)      On or about June 6, 2018, and having full knowledge of the Promissory Note-fraud schemes, Defendant Bollinger then explained the details of their "plan" and falsely represented to Plaintiffs that FOG had been dissolved, but they had a plan to get Plaintiffs stock in Oblon's new company SHRG.  These representations were false and Bollinger either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Bollinger's representation and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-fraud scheme.  But for Bollinger's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(f)     On or about June 6, 2018, and having full knowledge of the Promissory Note-fraud schemes, Defendant Bollinger explained that the Defendants could not directly give Plaintiffs shares in SHRG, but that they would need to use a go-between company so as not to raise any concerns with the SEC.  These representations were false and Bollinger either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Bollinger's representation and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-fraud scheme.  But for Bollinger's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(g)     On or about June 6, 2018, and having full knowledge of the Promissory Note-fraud schemes, Defendant Bollinger explained that in order for Plaintiffs to ever recover their initial investment and to preserve their ownership and equity interests in FOG, they would have to transfer and assign their interests in FOG to CTH.   These representations were false and Bollinger either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Bollinger's representation and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-Fraud scheme.  But for Bollinger's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their

ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(h)     Prior to Plaintiffs' execution of the Subscription Agreements, Defendants Brock and Bollinger made clear to Plaintiffs that they had foreknowledge of a pending acquisition of CTH by SHRG.  Brock and Bollinger explained that acquisition of CTH by SHRG was not public knowledge, and that Plaintiffs were not supposed to know this.  It was further explained to Plaintiffs, who were unsophisticated investors and who Defendants Oblon, Brock and Bollinger knew to be unsophisticated investors, that this was the only way to preserve their investment and equity ownership interests in FOG, but that the Defendants would be in violation of SEC rules.  Moreover, in furtherance of Defendants' scheme, prior to execution of the Subscription Agreements, Plaintiffs were instructed by Brock or Bollinger, and also by Oblon, to indicate they were "accredited" investors as part of the Subscription Agreements. Brock and Bollinger further instructed Plaintiffs to not buy any stock in SHRG and tell no one of the pending acquisition of CTH. Defendants Brock and Bollinger explained that once SHRG acquired CTH, Plaintiffs' stock in CTH would be converted to SHRG stock and that after a designated holding period Plaintiffs would have the option of selling a portion of SHRG stock to recoup their original investment while maintaining a SHRG share-value commensurate with their ownership and equity interests in FOG.  These representations were false and Brock and Bollinger either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Brock's and Bollinger's representations and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG

and the Promissory Note-fraud scheme.  But for Brock's and Bollinger's representations, Plaintiffs would have investigated further and not have continued with the "plan" (i.e., the CTH Stock-fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(i)     On or about July 26, 2018, and unbeknownst to Plaintiffs, Brock falsely represented to Plaintiffs (through Mr. Burback) that SHRG was in the process of acquiring CTH and that the shares of CTH would soon be converted to shares in SHRG.  These representations were false and Brock either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Brock's representation and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-fraud scheme.  But for Brock's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(j)     On or about June 1, 2019, and having full knowledge of the Promissory Note-fraud schemes, Defendant Brock falsely represented Plaintiffs that the deal for SHRG to purchase CTH was not going to happen and that because FOG was dissolved, and the "plan" they made to attempt to compensate Plaintiffs had fallen through, they were simply out of luck and that their investment, commissions, and their ownership and equity interests were lost.  These representations were false and Brock either knew they were false at the

time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Brock's representation and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-fraud scheme.  But for Brock's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(k)     On or about June 1, 2019, and having full knowledge of the Promissory Note-fraud schemes, Defendant Brock falsely stated that there was nothing else for them to do, or could do to recover their investments and ownership interests in FOG.  These representations were false and Brock either knew they were false at the time the representations were made, or made the false representations without regard to their truth or falsity.  Plaintiffs relied on Brock's representation and in reliance, Plaintiffs were put off the trail of Oblon's, Brock's and/or Does 1-5 fraudulent conduct in connection with their investments in FOG and the Promissory Note-fraud scheme.  But for Brock's representations, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

140.    Examples of the fraudulent, material omissions withheld from Plaintiffs in furtherance of the CTH Stock-fraud scheme are as follows:

(a)      None of Defendants Oblon, Brock, Thatch, Bollinger, SHRG, FOG, FOHI, Alchemist, or CTH ever informed Plaintiffs that the proposed CTH transaction and subsequent acquisition by SHRG was merely a ruse, fraudulent and unlawful from its inception, and that CTH had no valid purpose other than as an artifice of their fraud to perpetuate the CTH Stock-Fraud scheme and to conceal the Promissory Note-Fraud scheme.  These defendants had a duty to disclose these facts because they knew that Oblon, Brock, Bollinger and/or Thatch: (1) owed a fiduciary duty to Plaintiffs (as members of FOG o); (2) made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that made earlier representations to Plaintiffs untrue or misleading.  Plaintiffs relied on their silence/omissions and in reliance, had these defendants not remained silent, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(b)      On or about July 20, 2018, and again on October 10, 2019, Bollinger transmitted proposed settlement agreements to Plaintiffs, as well as subsequent correspondence in July 2020, all of which were in furtherance of the fraudulent scheme to deprive Plaintiffs of their investments and ownership interests in FOG and in CTH, Bollinger indicated that CTH, in combination with other entities, including at least Alchemist, would be used as the purported vehicle for them to recover their investments in FOG, interest thereon, and the profits earned on their equity ownership in FOG, among other benefits.  These defendants had a duty to disclose these facts because they knew that

Oblon, Brock, Bollinger and/or Thatch: (1) at least Oblon owed a fiduciary duty to Plaintiffs (as members of FOG); (2) made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that made earlier representations to Plaintiffs untrue or misleading.   Plaintiffs relied on their silence/omissions and in reliance, had these defendants not remained silent, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-Fraud scheme) to recover their investments and secure their ownership interests in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

(c)     At no time did any of the named defendants disclose the Promissory Note-Fraud scheme which they either had direct, personal knowledge of and/or acquired after the fact, did any of the named defendants disclose that the CTH Stock-Fraud scheme merely served as a separate fraudulent transaction to cover-up and secret the Promissory Note-Fraud schemes alleged herein, among other things.  These defendants had a duty to disclose these facts because they knew that Oblon, Brock, Bollinger and/or Thatch: (1) owed a fiduciary duty to Plaintiffs (as members of FOG); (2) made partial disclosures that created a false impression to Plaintiffs; (3) voluntarily disclosed some information to Plaintiffs, thus creating a duty to disclose the whole truth; and/or (4) discovered new information that made earlier representations to Plaintiffs untrue or misleading.  Plaintiffs relied on their silence/omissions and in reliance, had these defendants not remained silent, Plaintiffs would have investigated further and not have continued with the "plan" (*i.e.*, the CTH Stock-fraud scheme) to recover their investments and secure their ownership interests

in accordance with their equity interests in FOG pursuant to the terms of the Note Purchase Agreements.

141.    With respect to the Plaintiffs' purchase of their stock interests in CTH, Defendants offered each Plaintiff the identical (or nearly identical) terms and conditions and CTH share amounts in the CTH Subscription Agreement as the offering materials for their investment in CTH, which according to Defendants, was to serve as the vehicle for Plaintiffs to recover their investments in FOG, the interest thereon, and the additional consideration they bargained for with FOG, including their equity ownership and bonuses, among other things.  None of the statements (or omissions) made by these defendants, information provided by these defendants, or the materials provided to Plaintiffs by these defendants or others revealed that the scheme to have Plaintiffs invest in CTH was merely a ruse and that these defendants had no intention of utilizing CTH as the vehicle to recover their investments in FOG, the interest thereon, and the additional consideration they bargained for with FOG, including their equity ownership and bonuses, among other things.  On the contrary, the statements (and omissions) made by these defendants and the offering materials, including the CTH Subscription Agreements, propagated the impression that Plaintiffs were investing in a legal and legitimate enterprise and not a stock fraud-scheme, blessed by Defendants and their attorneys, that allowed these defendants to operate the CTH Stock-Fraud scheme for the purpose of putting Plaintiffs off the trail of and fraudulently conceal the Promissory Note-Fraud scheme and to ensure that Plaintiffs were fully and finally deprived of their investment in FOG, the interest thereon, and the additional consideration they bargained for with FOG, including their equity ownership and bonuses, so that these defendants could, upon information and belief, enrich themselves to the detriment of Plaintiffs to retain SHRG shares to the exclusion

of Plaintiffs, avoid SEC reporting requirements and disclosures of the totality of the fraudulent schemes alleged and described herein, among other things.

## Proximate Cause and Reliance

142.    The loss suffered by the Plaintiffs was foreseeable and a direct result of the establishment, promotion, and expansion of the CTH Stock-Fraud schemes by the Defendants because the ultimate collapse of the schemes, and harm to its participants, *i.e.*, the Plaintiffs (and others similarly situated), is a direct and foreseeable consequence of the structure of the CTH Stock-Fraud schemes as alleged and described herein.  There is a clear causal connection between the acts alleged herein and the injury suffered by the Plaintiffs.

143.    Defendants' promotion of the nature of the CTH stock transaction to serve as the vehicle to recover their investments in FOG, independently caused Plaintiffs to invest in CTH  and not only lose money, but also be excluded from the profits resulting from the secret transfer of FOG's assets to a successor entity (whether by name change, consolidation, merger or otherwise) whether Elepreneurs, Elevacity, and/or FOHI, which were ultimately sold to SSI, now SHRG.  But for these false and misleading CTH Stock-Fraud schemes alleged and described herein, Plaintiffs would not have been induced to invest and purchase the CTH stock. Plaintiffs' losses were a direct and proximate cause of their innocent participation in the CTH Stock-Fraud schemes. Plaintiffs necessarily and/or justifiably relied on the promotion of the CTH stock transaction to serve as the vehicle to recover their investments in FOG drove them to invest in the company.  Such reliance may be presumed from, among other things, the presumption that no one would knowingly invest in a company knowing that its investment moneys would be stolen with no intention to satisfy and secure their investments, as represented by Defendants.  The damages caused by the CTH Stock-

Fraud scheme and/or Defendants' fraudulent misrepresentations and material omissions were a necessary consequence of an inherently illegal scheme to defraud Plaintiffs.

144.    Individual reliance is not an element of a scheme liability under a Rule 10b-5(a) or (c) cause of action.  Notwithstanding, generalized proof shows evidence of Plaintiffs' reliance on Defendants' material misrepresentations, omissions and schemes to defraud such as to permit a commonsense inference of reliance applicable to each of them.  Here, each of the Plaintiffs signed identical or essentially identical CTH Subscription Agreements, and agreed to identical or essentially identical terms and conditions, compensation and equity structures based on these defendants' material misrepresentations and material omissions made to each one of them as a result of their collective negotiations with these defendants that, at times, were conducted by at least one of the plaintiffs and shared with the others.  Each Plaintiff was presented with a unified, consistent set of exaggerations, misrepresentations and omissions about their investment, how the purpose of their investment and that CTH was an ongoing, legitimate business that would serve as the vehicle to recover their investments in FOG, and there was no mention that the CTH investment was obtained with no intention to remunerate Plaintiffs for their investment in CTH or, as stated by Defendants, or that it would serve as the vehicle to recover their investments in FOG, the interest thereon, and the additional consideration they bargained for with FOG, including their equity ownership and bonuses, among other things.  It is proper to infer that no reasonable person would have joined a stock fraud scheme as alleged and described herein: rational people do not sign up for these types of schemes and certainly do not invest in companies knowing that its investment moneys would be stolen with no intention to satisfy the pre-existing obligations as held out by the individuals and corporate entities securing the investment.

**Damages**

145.    Plaintiffs suffered a loss of money composed of the costs paid to invest in CTH and were ultimately deprived of share ownership in Elevacity, Elepreneurs, FOHI, SHRG and/or Alchemist, which, as represented by Defendants (both individual and corporate) that would serve to compensate them for their investments in FOG, together with the interest thereon, and their ownership interest totaling a combined 22% of FOG.  In addition to the amounts paid for CTH shares totaling $583.33, each plaintiff lost subsequent share value in Elevacity, Elepreneurs, FOHI, SSI, SHRG and/or Alchemist that would cover the $33,333 they each made for their initial investments in FOG and the interest thereon, as well as their 7.33% equity interest in the assets of FOG, which became the assets of Elevacity, Elepreneurs, and/or FOHI (as FOG's successor in interest or by virtue of an illegal transfer of those assets between one or more of these entities) that were ultimately acquired by SSI, SHRG's predecessor in interest, as well as other consideration, including revenues from the Four Oceans Bonus Pools and other leadership bonuses.

**Scienter**

146.    Defendants' actions, as set forth herein, were made with such mental state to manipulate, deceive or defraud, or with such recklessness, as to constitute *scienter*. These defendants had a motive to operate and benefit from the operation of the CTH Stock-fraud scheme, and opportunity to conceal the fact that they were operating such a scheme.  Proof of such *scienter* can be inferred from the following:

(a)    Defendants benefitted in concrete and substantial ways from the operation of the CTH Stock-Fraud scheme and the previously alleged Promissory Note-fraud schemes. Upon the acquisition of FOHI by SHRG, which has been valued at almost $20,000,000 by SHRG, Defendant Oblon received millions of shares in SSI (converted to

SHRG shares), shares in Alchemist, considerable salaries, bonuses, stock options and, ultimately, a multimillion-dollar settlement from SHRG, despite SHRG and its officers and directors (or former officers and directors), Defendants Brock and Thatch, having full knowledge of, and ultimately embracing and adopting the fraudulent conduct associated with the CTH Stock-Fraud and Promissory Note-Fraud schemes alleged and described herein, as well as other bad faith conduct, including Defendant Oblon's *ultra vires* acts while at SHRG.  SHRG now shows an operating profit of millions of dollars per year following the acquisition of FOHI.  Upon information and belief, prior to acquiring FOHI, which was derived from these defendants Promissory Note-fraud scheme and utilized (and still utilizes) FOG assets, SHRG lost several million dollars a year and only became profitable after the acquisition of FOHI, *i.e.*, FOG itself as FOHI's predecessor in interest or, at a minimum, FOG's assets, including but not limited to, FOG's network marketing software platform, its individual product distributors, email lists, phone lists, and customer lists, all of which comprise FOG's proprietary and/or trade secret information, being transferred to Elepreneurs, Elevacity, and/or FOHI, which are held and being utilized by SHRG or its subsidiaries up to this day;

(b)     Defendants engaged in plainly fraudulent and illegal behavior. *See*, *e.g.*, averments made in connection with the CTH Stock-Fraud scheme at paras. 72 – 100, among others, which are incorporated here by reference;

(c)     Defendants had a specific understanding that each was engaged in the commission of a CTH Stock-fraud scheme or that it would be substantially likely that the operation would be found to be a Stock-Fraud scheme[20]:

> i.  Defendant Oblon, who is purportedly an experienced investor and founder of numerous multilevel marketing companies, knew he was not complying with existing laws and regulations in connection with the CTH Stock-fraud schemes. Defendant Oblon made material misrepresentations and omissions to Plaintiffs regarding the CTH Stock-fraud scheme. Defendant Oblon also knew that the CTH Stock-Fraud scheme was illegal.  Defendant Oblon therefore knew that the Plaintiffs' investments were induced in furtherance of a fraudulent scheme to deprive Plaintiffs of their investments in CTH and that CTH was not going to be used as the sole vehicle for them to recover their investments in FOG, interest thereon, or the profits earned on their equity ownership in FOG, among other benefits, but rather that it would require the combination of transactions with other entities, including at least Alchemist.  Defendant Oblon took affirmative steps by actions and omissions to disguise and/or conceal the CTH Stock-Fraud schemes (and the Promissory Note-Fraud schemes) from Plaintiffs.  By virtue of his service as a member, director, officer, shareholder, agent, and/or founder, Defendant Oblon on behalf of himself, and acting with actual and/or apparent authority on behalf of FOG, FOHI, SHRG, Alchemist, and/or CTH, took affirmative steps by actions and omissions to disguise and/or conceal the CTH Stock-fraud schemes, as well as the Promissory Note-Fraud schemes from Plaintiffs.

> ii.  Defendant FOG, by and through Defendant Oblon, the founder, member, and manager of FOG, as well as Defendants Brock, Thatch, as current or former officers and directors of SHRG, the parent company of FOG, had actual, personal knowledge (or constructive knowledge) of the material misrepresentations, omissions and conduct directed to Plaintiffs regarding the CTH Stock-Fraud schemes as alleged and described herein, or came to know of them, including those allegations in the preceding subparagraph. Defendants Oblon, Brock and Thatch had actual and apparent authority to act on FOG's behalf.

---

[20] As alleged herein, Defendants Brock, Thatch, Bollinger, Alchemist, SHRG, FOHI and CTH subsequently learned of and had full knowledge of the Promissory Note-Fraud scheme alleged and described herein, ultimately embraced and adopted the fraudulent conduct associated with the Promissory Note-Fraud scheme alleged and described herein, and by participating in the CTH Stock-fraud schemes, individually and with actual and apparent authority for the corporate defendants, engaged in additional fraudulent acts to conceal the schemes and profit from them to their benefit and to the detriment of Plaintiffs.

iii.  Defendant FOHI, by and through Defendant Oblon, the founder, and upon information and belief, a current or former officer, director and shareholder of FOHI, as well as Defendants Brock and Thatch, as current or former officers and directors of SHRG, the parent company of FOHI, had actual, personal knowledge (or constructive knowledge) of the material misrepresentations, omissions and conduct directed to Plaintiffs regarding the CTH Stock-Fraud schemes as alleged and described herein, or came to know of them, including those allegations in the preceding subparagraphs. Defendants Oblon, Brock and Thatch had actual and apparent authority to act on FOHI's behalf.

iv.  Defendant Elepreneurs, by and through Defendant Oblon, the founder, and upon information and belief, a current or former officer, director and shareholder of Elepreneurs, as well as Defendants Brock and Thatch, as current or former officers and directors of SHRG, the parent company of Elepreneurs, had actual, personal knowledge (or constructive knowledge) of the material misrepresentations, omissions and conduct directed to Plaintiffs regarding the CTH Stock-Fraud schemes as alleged and described herein, or came to know of them, including those allegations in the preceding subparagraphs. Defendants Oblon, Brock and Thatch had actual and apparent authority to act on Elepreneur's behalf.

v.  Defendant Elevacity, by and through Defendant Oblon, the founder, and upon information and belief, a current or former officer, director and shareholder of Elevacity, as well as Defendants Brock and Thatch, as current or former officers and directors of SHRG, the parent company of Elevacity, had actual, personal knowledge (or constructive knowledge) of the material misrepresentations, omissions and conduct directed to Plaintiffs regarding the CTH Stock-Fraud schemes as alleged and described herein, or came to know of them, including those allegations in the preceding subparagraphs. Defendants Oblon, Brock and Thatch had actual and apparent authority to act on Elevacity's behalf.

vi.  Defendant SHRG, by and through Defendant Oblon, a current or former officer, director and shareholder of SHRG, as well as Defendants Brock and Thatch, as current or former officers, directors and shareholders of SHRG, had actual, personal knowledge (or constructive knowledge) of the material misrepresentations, omissions and conduct directed to Plaintiffs regarding the CTH Stock-Fraud schemes as alleged and described herein, or came to know of them, including those allegations in the preceding subparagraphs. Defendants Oblon, Brock and Thatch had actual and apparent authority to act on SHRG's behalf.

vii.   Defendant Alchemist, the largest shareholder of SHRG, by and through Defendant Oblon, the founder (or purported founder) and current or former largest shareholder of Alchemist, as well as Defendant Brock the founder (or purported founder) and current or former largest shareholder of Alchemist, had actual, personal knowledge (or constructive knowledge) of the material misrepresentations, omissions and conduct directed to Plaintiffs regarding the CTH Stock-Fraud schemes as alleged and described herein, or came to know of them, including those allegations in the preceding subparagraphs. Defendants Oblon and Brock had actual and apparent authority to act on Alchemist's behalf.

viii.   Defendant CTH, by and through Defendant Bollinger, a current or former officer, director and shareholder of CTH, had actual, personal knowledge (or constructive knowledge) of the material misrepresentations, omissions and conduct directed to Plaintiffs regarding the CTH Stock-Fraud schemes as alleged and described herein, or came to know of them, including those allegations in the preceding subparagraphs. Defendants Bollinger had actual and apparent authority to act on CTH's behalf.

ix.   Defendant Brock knew he was not complying with existing laws and regulations with respect to the CTH Stock-Fraud schemes. Defendant Brock made material misrepresentations and omissions to Plaintiffs regarding the CTH Stock-Fraud scheme.  Defendant Brock also knew that the CTH Stock-Fraud scheme was illegal.  Defendant Brock therefore knew that the Plaintiffs' investments were induced in furtherance of a fraudulent scheme to deprive Plaintiffs of their investments in CTH and that CTH was not going to be used as the sole vehicle for them to recover their investments in FOG, interest thereon, or the profits earned on their equity ownership in FOG, among other benefits, but rather that it would require the combination of transactions with other entities, including at least Alchemist..  Defendant Brock took affirmative steps by actions and omissions to disguise and/or conceal the CTH Stock-Fraud schemes (and the Promissory Note-Fraud schemes) from Plaintiffs, including but not limited to proposing that Plaintiffs' execute settlement agreements (both versions).  By virtue of his service as a member, director, officer, shareholder, agent, and/or founder, Defendant Brock on behalf of himself, and acting with actual and/or apparent authority on behalf of FOG, FOHI, SHRG, and/or Alchemist, took affirmative steps by actions and omissions to disguise and/or conceal the CTH Stock-Fraud schemes, as well as the Promissory Note-fraud schemes from Plaintiffs.  Defendant Brock had actual, personal knowledge (or constructive knowledge) of the material misrepresentations, omissions and conduct directed to Plaintiffs regarding the CTH Stock-Fraud schemes as alleged and described herein, or came to know of them, including those allegations in the

preceding subparagraphs. Defendant Brock had actual and apparent authority to act on FOG's, FOHI's, SHRG's and Alchemist's behalf.

x.   Defendant Thatch knew he was not complying with existing laws and regulations with respect to the CTH Stock-fraud schemes. Defendant Thatch made material misrepresentations and omissions to Plaintiffs regarding the CTH Stock-Fraud scheme. Defendant Thatch also knew that the CTH Stock-Fraud scheme was illegal.   Defendant Thatch therefore knew that the Plaintiffs' investments were induced in furtherance of a fraudulent scheme to deprive Plaintiffs of their investments in CTH and that CTH was not going to be used as the sole vehicle for them to recover their investments in FOG, interest thereon, or the profits earned on their equity ownership in FOG, among other benefits, but rather that it would require the combination of transactions with other entities, including at least Alchemist..   Defendant Thatch took affirmative steps by actions and omissions to disguise and/or conceal the CTH Stock-Fraud schemes (and the Promissory Note-Fraud schemes) from Plaintiffs.   By virtue of his service as a member, director, officer, shareholder, agent, and/or founder, Defendant Thatch on behalf of himself, and acting with actual and/or apparent authority on behalf of FOG, FOHI, and/or SHRG, took affirmative steps by actions and omissions to disguise and/or conceal the CTH Stock-Fraud schemes, as well as the Promissory Note-Fraud schemes from Plaintiffs.   Defendant Thatch had actual, personal knowledge (or constructive knowledge) of the material misrepresentations, omissions and conduct directed to Plaintiffs regarding the CTH Stock-fraud schemes as alleged and described herein, or came to know of them, including those allegations in the preceding subparagraphs.   Defendant Thatch had actual and apparent authority to act on FOG's, FOHI's, and SHRG's behalf.

xi.   Defendant Bollinger knew he was not complying with existing laws and regulations with respect to the CTH Stock-fraud schemes. Defendant Bollinger made material misrepresentations and omissions to Plaintiffs regarding the CTH Stock-fraud scheme. Defendant Bollinger also knew that the CTH Stock-fraud scheme was allegedly illegal.   Defendant Bollinger therefore knew that the Plaintiffs' investments were induced in furtherance of a fraudulent scheme to deprive Plaintiffs of their investments in CTH and that CTH was not going to be used as the sole vehicle for them to recover their investments in FOG, interest thereon, or the profits earned on their equity ownership in FOG, among other benefits, but rather that it would require the combination of transactions with other entities, including at least Alchemist..   Defendant Bollinger took affirmative steps by actions and omissions to disguise and/or conceal the CTH Stock-fraud schemes (and the Promissory Note-fraud schemes) from Plaintiffs. By virtue of his service as a member, director, officer, shareholder, agent, and/or founder, Defendant Bollinger on

behalf of himself, and acting with actual and/or apparent authority on behalf of CTH, took affirmative steps by actions and omissions to disguise and/or conceal the CTH Stock-fraud schemes, as well as the Promissory Note-fraud schemes from Plaintiffs.  Defendant Thatch had actual, personal knowledge (or constructive knowledge) of the material misrepresentations, omissions and conduct directed to Plaintiffs regarding the CTH Stock-fraud schemes as alleged and described herein, or came to know of them, including those allegations in the preceding subparagraphs. Defendant Bollinger had actual and apparent authority to act on CTH's behalf.  Bollinger's conduct is especially troubling considering that he is an investment advisor representative who, upon information and belief, is registered with the state of Utah and the SEC and must maintain and adhere to his fiduciary obligations, as well as obligations to disclose conflicts of interests and his fee arrangements.

xii.   Defendant Does 1-5, who are currently unknown to Plaintiffs, had personal knowledge of the material misrepresentations, omissions and conduct attributed to Defendant Oblon and made to Plaintiffs regarding the CTH Stock-fraud scheme as alleged and described herein, including those allegations in the preceding subparagraphs, and conspired, aided and abetted and otherwise assisted with the perpetration of the CTH Stock-fraud scheme perpetrated against Plaintiffs. Does 1-5 likely consist of one or more individuals, companies and/or their owners and/or investors, and/or their respective attorneys or agents.

(d)   In addition, Defendants Oblon, Brock, Thatch, SHRG, FOG, FOHI and Alchemist had personal knowledge of the contents of the reports SHRG filed with the Securities and Exchange Commission, which specifically excluded and failed to account for the Promissory Note-Fraud schemes and/or the CTH Stock-Fraud schemes alleged and described herein.

147.   Plaintiffs suffered damages in that they lost moneys through their investment and purchase of the CTH shares, as well as the promissory notes attendant to the Note Purchase Agreements, as well as the interest earned on their investments, and including the profits from their equity ownership interests in FOG, among other benefits.

148.   Plaintiffs damages may be measured in actual damages.

**COUNT 3:**    **STATUTORY FRAUD – TEX. BUS. & COM. CODE § 27.01 – AS TO (1) DEFENDANTS OBLON, FOG, FOHI, AND DOES 1-5 FOR PROMISSORY NOTE-FRAUD SCHEMES; AND (2) ALL DEFENDANTS FOR CTH STOCK-FRAUD SCHEME.**

149.    Plaintiffs incorporate the facts and allegations set forth above.

150.    The elements of a cause of action for statutory fraud under Texas law are:

(a) a transaction involving real estate or securities; and

b.  during the transaction, the defendant:

(1)  made a false representation of a past or existing material fact;

(2)  made a false promise; or

(3)  benefited by not disclosing that a third party's representation or promise was false;

c.  the false representation or promise was made for the purpose of inducing the plaintiff to enter into a contract, was material, made with the intention of not fulfilling it, and made for the purpose of inducing the person to enter into the contract;

d.  the plaintiff relied on the false representation or promise by entering into the contract; and

e.  the plaintiff was damaged by the reliance on the false representation or promise.[21]

151.    The elements of statutory fraud are essentially identical to those of common law fraud (addressed in Count 4, below) except that Plaintiffs need not prove Defendants' knowledge or recklessness as a prerequisite to recovery.[22]  The facts as alleged herein establish that Defendants made false representations or promises (and/or material omissions of fact) with actual knowledge

---

[21] TEX. BUS. & COM. CODE § 27.01; *Anderton v. Cawley*, 378 S.W.3d 38, 56 (Tex. App.—Dallas 2012, no pet.)

[22] *See* TEX. BUS. & COM. CODE § 27.01; *see also*, *e.g.*, *Henning v. One West Bank*, 405 S.W.3d 950, 963 (Tex. App.—Dallas 2013, no pet.); *Trinity Indus. v. Ashland, Inc.*, 53 S.W.3d 852, 867 (Tex. App.—Austin 2001, pet. denied).

of the falsity thereof, thus entitling Plaintiffs to exemplary, as well as actual, damages for statutory fraud. TEX. BUS. & COM. CODE § 27.01(c)-(d).

152.    The cause of action for statutory fraud entitles plaintiffs to attorneys' fees, expert witness fees, and costs, in addition to actual, and potentially also exemplary, damages. TEX. BUS. & COM. CODE §§ 27.01(b)-(e).

153.    All of the elements of statutory fraud are met here, including Defendants' knowingly false representations, promises, material omissions and/or benefiting by not disclosing that a third party's representations, promises or material omissions were false. There were, first, as described, transactions involving securities between Plaintiffs and certain defendants in connection with the Promissory Note-Fraud schemes, as well as transactions involving securities between Plaintiffs and the defendants in connection with and the CTH Stock-fraud schemes as alleged and described herein.

154.    In connection with the transactions involving securities, as alleged and described herein, Defendants made multiple, false representations of material facts, failed to disclose material facts when they had a duty to do so, and knowingly made false promises regarding future conduct.  All of these Defendants benefitted by not disclosing that their fellow officers,' directors,' agents,' and/or representatives' representations to Plaintiffs were false, by failing to disclose material facts when they had a duty to do so, and failing to disclose their true intentions.

155.    Defendants Oblon's and FOG's (by and through Oblon), false representations, failures to disclose, false promises (and material omissions) were made for the purpose of inducing Plaintiffs to, among other things: (a) invest in FOG, (b) contract with others to use their own personal funds to invest in FOG.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

156.    Defendants Oblon's, Brock's, Thatch's, and Bollinger's, as well as FOG's, SHRG's, FOHI's, Elepreneurs', Elevacity's, Alchemist's and CTH's, false representations, failures to disclose, false promises (and material omissions) were made for the purpose of concealing the fraudulent conduct complained of herein and, at a minimum, inducing Plaintiffs to contract with others to purchase stock from CTH as the method of investment in SHRG, which would allow plaintiffs to recover the totality of their investments in FOG, including their equity ownership interests, among other things.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

157.    All Defendants also committed fraud on Plaintiffs by engaging in and perpetuating, among other things: (a) the fraudulent schemes identified herein, (b) falsely misleading the Plaintiffs as to the true state of Defendants' business affairs, (c) conspiring to violate the securities laws in connection with the Promissory Note-fraud scheme and the CTH Stock-Fraud scheme, (d) diverting, and conspiring to divert, Plaintiffs' investment funds and equity interests in FOG to themselves, and (e) self-dealing and other *ultra vires* acts, among other things.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

158.    Plaintiffs justifiably relied on the Defendants false representations, failures to disclose material facts, and false promises as described and alleged herein in relation to the Promissory Note-fraud and CTH Stock-fraud schemes.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

159.    Plaintiffs' reliance on Defendants' false representations, failure to disclose material facts, and false promises to perform caused Plaintiffs' injury, including actual damages.

160.    As a direct and proximate result of such fraudulent conduct, Plaintiffs have suffered, and will continue to suffer, injury, loss, harm or damage, which were a natural, probable

and foreseeable consequence of the conduct complained of herein.  As such, Plaintiffs are entitled to an award of all available economic, compensatory, exemplary, damages, attorneys' fees, costs, and pre- and/or post-judgment interest to the extent allowed by law, as well as appropriate equitable remedies (including but not limited to, to the extent available, disgorgement and/or receivership or constructive trust).

161.   Plaintiffs also seek to recover exemplary damages, uncapped, because Defendants secured the execution of the Note Purchase Agreements and the Subscription Agreements by deception.

162.   Plaintiffs further seek an award of their reasonable attorneys' fees, expert witness fees, and costs, under TEX. BUS. & COM. CODE § 27.01(e) and/or other applicable authority.

**COUNT 4:    COMMON LAW FRAUD – AS TO (1) DEFENDANTS OBLON, FOG, FOHI, AND DOES 1-5 FOR PROMISSORY NOTE-FRAUD SCHEMES; AND (2) ALL DEFENDANTS FOR CTH STOCK-FRAUD SCHEME.**

163.   Plaintiffs incorporate the facts and allegations set forth above.

164.   In Texas, the elements of common law fraud are:

(a) the defendant made a representation to the plaintiff;

b.   the representation was false;

c.   the defendant made the representation:

(1)  knowing it was false; or

(2)  recklessly, as a positive assertion, and without knowledge of its truth;

d.   the defendant made the representation with intent that the plaintiff rely on it;

e.   the plaintiff relied on the representation; and

f.   the plaintiff was damaged by the representation.[23]

165.    In addition to actual damages, these Plaintiffs are entitled to exemplary damages upon a showing of mere fraud, gross negligence, and/or that the Defendants acted with malice, and "[m]alice may be inferred from a wrongful act done intentionally in violation of [a party's] rights."[24]

166.    All of the elements of common law fraud are satisfied here. Defendants made false representations, failed to disclose material facts when they had a duty to do so, and made false promises of future performance.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

167.    Defendants committed fraud on Plaintiffs by engaging in and perpetuating, among other things: (a) the fraudulent schemes identified herein, (b) falsely misleading the Plaintiffs as to the true state of the corporate Defendants' business affairs, (c) conspiring to violate the securities laws in connection with the Promissory Note-Fraud and CTH Stock-Fraud schemes, (d) diverting, and conspiring to divert, Plaintiffs' investment funds and equity interests in FOG to themselves, and (e) self-dealing and other *ultra vires* acts, among other things

168.    Defendants also made false representations, failures to disclose, and false promises that were made for the purpose of inducing Plaintiffs to, among other things: (a) invest in FOG, (b) contract with others to use their own personal funds to invest in FOG.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

---

[23] *See, e.g., Suarez v. Fernandez*, No. 05-18-00921-CV, 2019 WL 1922732 *2 (Tex. App.—Dallas Apr. 30, 2019), citing *Henning v. OneWest Bank FSB*, 405 S.W.3d 950, 963 (Tex. App.—Dallas 2013, no pet.).

[24] *See* TEX. CIV. PRAC. & REM. CODE § 41.003(a); *see also, e.g., Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 618 (Tex. App.—Waco 2000), citing, inter alia, and *Accent Bldrs. Co. v. Southwest Concrete Sys., Inc.*, 679 S.W.2d 106, 111 (Tex. App.—Dallas 1984, writ ref'd n.r.e.).

169.    Defendants Oblon, Brock, Thatch, Bollinger, FOG, FOHI, SHRG, Elepreneurs, Elevacity, and CTH also made false representations, failures to disclose, and false promises that were made for the purpose of inducing Plaintiffs to, among other things: (a) contract with others to use their own personal funds to fund the CTH stock transfer; and (b) contract with others to purchase stock from CTH as the method of investment in SHRG.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

170.    Defendants' representations and promises were material and they were false. Defendant's failures to disclose were material, and rendered Plaintiffs' decision to invest in FOG, and/or their decision to invest in CTH as a vehicle to recover their FOG interests, inherently unfair.

171.    When Defendants made the representations and promises, they knew they were false.  In the alternative, these Defendants made the representations and promises recklessly, as positive assertions, and without knowledge of their truth.

172.    Defendants made the representations and promises, and failed to make disclosures, with the intent that Plaintiffs act in reliance on them.

173.    Plaintiffs justifiably relied on Defendants representations, failures to disclose, and false promises of future performance.  Before Plaintiffs executed the Note Purchase Agreements and the Subscription Agreements, they did not know that Defendants' representations and promises were false, nor were they aware of facts indicating they were false, and Plaintiffs were not aware of the material information that Defendants withheld and failed to disclose.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

174.    Defendants false statements and promises, and failures to disclose, caused Plaintiffs' injury, including actual damages.

175.     As a direct and proximate result of such fraudulent conduct, Plaintiffs have suffered, and will continue to suffer, injury, loss, harm or damage, which were a natural, probable and foreseeable consequence of the actions of Defendants.  As such, Plaintiffs are entitled to an award of all available economic, compensatory, exemplary, damages, attorneys' fees, costs, and pre- and/or post-judgment interest to the extent allowed by law, as well as appropriate equitable remedies (including but not limited to, to the extent available, disgorgement and/or receivership or constructive trust).

176.     Plaintiffs also seek to recover exemplary damages uncapped, because Defendants secured the execution of the Note Purchase Agreements and the Subscription Agreements by fraud, malice, or at the very least gross negligence within the meaning of TEX. CIV. PRAC. & REM. CODE § 41.003.

**COUNT 5:     FRAUD BY NONDISCLOSURE – AS TO (1) DEFENDANTS OBLON, FOG, FOHI, AND DOES 1-5 FOR PROMISSORY NOTE-FRAUD SCHEMES; AND (2) ALL DEFENDANTS FOR CTH STOCK-FRAUD SCHEME.**

177.     Plaintiffs incorporate the facts and allegations set forth above.

178.     The elements of fraud by nondisclosure are:

(a) the defendant failed to disclose facts to the plaintiff;

b.   the defendant had a duty to disclose those facts;

c.   the facts were material;

d.   the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts;

e.   the defendant was deliberately silent when it had a duty to speak;

f.   by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting;

g.   the plaintiff relied on the defendant's nondisclosure; and

> h. the plaintiff was injured as a result of acting without that knowledge.[25]

179.   The failure to disclose may be negligent when a plaintiff shows:

> a. the representation was made by a defendant in the course of his business, or in a transaction in which he had a pecuniary interest;
>
> b. the defendant supplied "false information" for the guidance of others in their business;
>
> c. the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and
>
> d. the plaintiff suffered pecuniary loss by justifiably relying on the representation.[26]

180.   Fraud by nondisclosure is a subcategory of fraud that arises when a defendant breaches a duty of disclosure between the parties (because nondisclosures of material facts are as misleading as positive misrepresentations).[27]

181.   As with respect to statutory fraud and common law fraud, all of these elements are satisfied here. Defendants Oblon, Brock, Thatch, and Bollinger, and the corporate defendants FOG, FOHI, SHRG, Alchemist and CTH, concealed from or failed to disclose certain facts to Plaintiffs which they had a duty to disclose, among them: (a) the fraudulent schemes identified herein, (b) falsely misleading Plaintiffs as to the true state of the corporate Defendants' business affairs, (c) conspiring to violate the securities laws in connection with the Promissory Note-Fraud and CTH Stock-Fraud schemes, (d) diverting, and conspiring to divert, Plaintiffs' investment funds and equity interests in FOG to SHRG, and (e) self-dealing and other *ultra vires* acts, among other things.

---

[25] *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied).

[26] *Id*., 399 S.W.3d at 308.

[27] *See*, *e.g.*, *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013).

182.    Defendants concealed from or failed to disclose certain facts to Plaintiffs which they had a duty to disclose, for the purpose of inducing Plaintiffs to, among other things: (a) invest in FOG (now FOHI); and (b) invest in CTH.

183.    Defendants had a duty to Plaintiffs that required them to disclose facts to Plaintiffs.

184.    The undisclosed facts, as alleged herein, were material, and Defendants knew that Plaintiffs were ignorant of these facts and did not have an equal opportunity to discovery these facts.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

185.    Defendants were deliberately silent when they had a duty to speak.

186.    By failing to disclose the facts as alleged herein, Defendants intended to perpetuate a fraud on Plaintiffs.

187.    Plaintiffs justifiably relied upon Defendants nondisclosures.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

188.    Defendants' failures to disclose, caused Plaintiffs' injury, including actual damages.

189.    As a direct and proximate result of such fraudulent conduct, Plaintiffs have suffered, and will continue to suffer, injury, loss, harm or damage, which were a natural, probable and foreseeable consequence of Defendants'.  As such, Plaintiffs are entitled to an award of all available economic, compensatory, exemplary, damages, attorneys' fees, costs, and pre- and/or post-judgment interest to the extent allowed by law, as well as appropriate equitable remedies (including but not limited to, to the extent available, disgorgement and/or receivership or constructive trust).

190.    Plaintiffs also seek to recover exemplary damages uncapped, because Defendants secured the execution of the Note Purchase Agreements and the Subscription Agreements by fraud,

malice, or at the very least gross negligence within the meaning of TEX. CIV. PRAC. & REM. CODE

§ 41.003.

**COUNT 6:       UNJUST ENRICHMENT[28] – AS TO ALL DEFENDANTS**

191.     Plaintiffs incorporate the facts and allegations set forth above.

192.     Texas courts have described instances of unjust enrichment as follows:

> Unjust enrichment occurs when a person has wrongfully secured a benefit or has
> passively received one which it would be unconscionable to retain….A person is
> unjustly enriched when he obtains a benefit from another by fraud, duress, or the
> taking of an undue advantage….When a person has been unjustly enriched by the
> receipt of benefits in a manner not governed by contract, the law implies a
> contractual obligation upon that person to restore the benefits to the plaintiff….A

---

[28] Texas Courts, including the Houston First Court of Appeals, recognize "unjust enrichment" as
an independent cause of action. *See Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex.
App.—Houston [1st Dist.] 2013, no pet.)("This court has previously held that unjust enrichment
is an independent cause of action"), citing *Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460
(Tex.App.-Houston [1st Dist.] 2007, pet. denied) (citing, in turn, *HECI Exploration Co. v. Neel*,
982 S.W.2d 881, 891 (Tex.1998)); *Cristobal v. Allen*, No. 01–09–00126–CV, 2010 WL 2873502,
at *6 (Tex.App.-Houston [1st Dist.] July 22, 2010, no pet.) (mem. op.); accord, *Freeman v.
Harleton Oil & Gas, Inc.*, 528 S.W.3d 708, 742 (Tex.App.-Texarkana 2017).

Though Texas courts refer to unjust enrichment rather as a "theory of liability" only available with
other causes of action (including fraud, as alleged here), this is largely a distinction without a
difference, because even when referred to as a "theory of liability," in Texas it both allows a
plaintiff "recovery in quasi-contract," "restitution" or quantum meruit [*Cristobal v. Allen*, 01-09-
00126-CV, 2010 WL 2873502, at *6 (Tex. App.—Houston [1st Dist.] July 22, 2010, no pet.).],
and is "relevant to damages calculations"[*See, e.g., Juan Antonio Sanchez, PC v. Bank of S. Tex.*,
7:20-CV-00139, 2020 WL 6060868, at *11 (S.D. Tex. Oct. 14, 2020)(applying Texas law)]. While
the Texas Supreme Court has not yet explicitly ruled on this terminology question, that Court, too,
has referred to both unjust enrichment "claims" and "cause of action." *See, e.g., Elias v. Pilo*, 781
Fed. Appx. 336, 338, n.3 (5th Cir. 2019)(the Fifth Circuit noting the Texas Supreme Court's
apparent agreement with the Houston 1st District Court of Appeals' reference to unjust enrichment
as an independent cause of action before concluding the Fifth Circuit need not address the issue).

The United State District Court for the Southern District of Texas in Houston, however, likewise
recently recognized unjust enrichment as an independent cause of action under Texas law. *See
Harris County, Tex. v. Eli Lilly & Co.*, CV H-19-4994, 2020 WL 5803483, at *17 (S.D. Tex. Sept.
29, 2020), citing *Mora v. Koy*, No. CIV.A. H-12-3211, 2013 WL 2289887, at *5 (S.D. Tex. May
23, 2013)( "although 'Texas courts may waffle about whether unjust enrichment is a theory of
recovery or an independent cause of action ... either way, they have provided the plaintiff with
relief when the defendant has been unjustly enriched'"). *Id.* (citations omitted).

> plaintiff may also recover under this equitable doctrine if a contemplated agreement is unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons.

*Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111–12 (Tex. App.—Houston [1st Dist.] 2013, no pet.)(citations omitted; bolding added); *see also Cristobal v. Allen*, 01-09-00126-CV, 2010 WL 2873502, at *6 (Tex. App.—Houston [1st Dist.] July 22, 2010, no pet.)("A plaintiff recovers under an unjust enrichment theory if a defendant obtains a benefit from the plaintiff 'by fraud, duress, or the taking of an undue advantage'," or "when the defendant wrongfully secures a benefit or passively receives a benefit which would be unconscionable to retain.").

193.    That is, while some cases have held that unjust enrichment is not appropriate where a "valid, express contract governing the subject matter of the dispute exists" (*Eun Bok Lee*, 411, S.W.3d 95 at 112), unjust enrichment is still available, even where an agreement exists, where such agreement is tainted by fraud or illegality, or is otherwise "unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons." *Id.*, 411 S.W.3d at 111); see also *Houle v. Casillas*, 594 S.W.3d 524, 555 (Tex. App.—El Paso 2019, no pet.)(noting that, despite the existence of a valid, express contract, "when a person has been unjustly enriched by the receipt of benefits in a manner not governed by contract, the law implies a contractual obligation upon that person to restore the benefits to the plaintiff")(citations omitted).

194.    Moreover, significantly, in the case of unjust enrichment, unlike other theories of recovery or causes of action:

> The *right to recover under an unjust enrichment theory does not depend on the existence of a wrong*….The doctrine is based on the equitable principle that one who receives benefits, *even passively*, which would be unjust to retain ought to make restitution for those benefits….

*Walker v. Walker*, 14-16-00357-CV, 2017 WL 1181359, at *8 (Tex. App.—Houston [14th Dist.] Mar. 30, 2017, no pet.)(citations omitted; emphasis added).

195.    Here, the elements of unjust enrichment – whether considered an independent cause of action and/or as an additional theory of recovery in connection with Plaintiffs' other causes of action – are also plainly satisfied. For the reasons already detailed in this Complaint's factual recitations and discussion of Plaintiffs' foregoing other causes of action (including but not limited to those for Securities Fraud (Counts 1 and 2), Statutory Fraud, Common Law Fraud, and/or Fraud by Non-Disclosure), Defendants, in connection with their fraud and other cited actionable acts and omissions, have "wrongfully secured a benefit or ha[ve] passively received one [or more] which it would be unconscionable to retain…," and thus have unjustly enriched themselves by "obtain[ing] a benefit from [Plaintiffs] by fraud, duress, or the taking of an undue advantage." *Eun Bok Lee*, 411 S.W.3d 95 at 111–12.

196.    At a minimum, Defendants, including SHRG, have been unjustly enriched because the principal assets of FOG, which include, among other things, FOG's network marketing software platform, its individual product distributors, email lists, phone lists, and customer lists, all of which comprise FOG's proprietary and/or trade secret information, were transferred (secretly or otherwise) to one or more of Elepreneurs, Elevacity, and/or FOHI, whether by name change, consolidation, merger, or otherwise, and being held by Elepreneurs, Elevacity, and/or FOHI at the time they were acquired by SHRG on or about October 9, 2017, which assets, upon information and belief, are currently being utilized in whole or in part by SHRG or its subsidiaries today.

197.    Alternatively, Defendants also are liable to Plaintiffs for unjust enrichment, because the transactions at issue in this Complaint associated with securities – as well as other agreements executed by Plaintiffs associated with and/or in reliance on those transactions – are either, for the reasons already detailed in this Complaint, are not governed by a valid and applicable contract, but rather are (or should be deemed, as a matter of law) "unenforceable, impossible, not fully

performed, thwarted by mutual mistake, or void for other legal reasons." *Eun Bok Lee*, 411 S.W.3d 95 at 12; *Houle v. Casillas*, 594 S.W.3d at 555.

**COUNT 7:    CIVIL CONSPIRACY TO COMMIT FRAUD AND/OR OTHER UNLAWFUL PURPOSES – AS TO ALL DEFENDANTS**

198.    Plaintiffs incorporate the facts and allegations set forth above.

199.    The elements of a conspiracy claim in Texas are:

(a) the defendant was a member of a combination of two or more persons;

(b) the object of the combination was to accomplish:

(1)  an unlawful purpose, or

(2)  a lawful purpose by unlawful means;

c.   the members had a meeting of the minds on the object or course of action;

d.   one of the members committed an unlawful, overt act to further the object or course of action; and

e.   the plaintiff suffered injury as a proximate result of the wrongful act.[29]

200.    Fraud (as well as its other permutations alleged herein) is a proper basis for a conspiracy claim in Texas,[30] and the conspiracy may be "established by proof of facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of the common design, intention, or purpose of the alleged conspirators," and "inferences may be drawn from joint participation in the transactions and from enjoyments of the fruits of the transactions on the part of the defendants."[31]

---

[29] *See*, *e.g.*, *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017).

[30] *See*, *e.g.*, *Westergren v. Jennings*, 441 S.W.3d 670, 683-84 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

[31] *Id.,* 441 S.W.3d at 683 (citations omitted).

201.    Here, too, the facts alleged herein satisfy all of the required elements for conspiracy. At all times relevant hereto, Defendants conspired and participated in: (a) the fraudulent schemes identified herein (i.e., the Promissory Note-Fraud scheme and/or the CTH Stock-Fraud scheme), (b) falsely misleading Plaintiffs as to the true state of the corporate Defendants' business affairs, (c) conspiring to violate the securities laws in connection with the Promissory Note-Fraud and the CTH Stock-Fraud schemes, (d) diverting, and conspiring to divert Plaintiffs' investment funds and equity interests in FOG to themselves, and (e) self-dealing and other *ultra vires* acts, among other things.

202.    Defendants' efforts to conspire and aid and abet one another with the conduct complained of herein, led to the commission of fraud upon Plaintiffs.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

203.    Defendants' false statements and promises, and failures to disclose, upon which Plaintiffs' justifiably relied, caused Plaintiffs injury, including actual damages.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

204.    As a direct and proximate result of the conduct complained of herein, Plaintiffs have suffered, and will continue to suffer, injury, loss, harm or damage, which were a natural, probable and foreseeable consequence of the conduct alleged herein.  As such, Plaintiffs are entitled to an award of all available economic, compensatory, exemplary, damages, attorneys' fees, costs, and pre- and/or post-judgment interest to the extent allowed by law, as well as appropriate equitable remedies (including but not limited to, to the extent available, disgorgement and/or receivership or constructive trust).

**COUNT 8:    AIDING AND ABETTING, ASSISTING OR ENCOURAGING AND/OR ASSISTING AND PARTICIPATING – AS TO ALL DEFENDANTS**

205.    Plaintiffs incorporate the facts and allegations set forth above.

206.    Joint liability may be imposed under Texas law for what has traditionally been referred to as "aiding and abetting" under an "assisting or encouraging" and/or "assisting and participating" theories of recovery.  And one may be held liable under such theories for aiding and abetting any of the varieties of fraud, as well as torts including negligent (as with intentional, fraudulent) misrepresentation.[32]  The elements of aiding and abetting under an "assisting or encouraging" theory of joint liability are:

(a)  the primary actor committed a tort;

b.   the defendant had knowledge that the primary actor's conduct constituted a tort;

c.   the defendant had the intent to assist the primary actor in committing the tort;

d.   the defendant gave the primary actor assistance or encouragement; and

e.   the defendant's assistance or encouragement was a substantial factor in causing the tort.[33]

The elements of aiding and abetting under an "assisting and participating" theory are:

a.   the primary actor's activity accomplished a tortious result;

b.   the defendant provided substantial assistance to the primary actor in accomplishing the tortious result;

c.   the defendant's own conduct, separate from the primary actor's, was a breach of duty to the plaintiff.

d.   the defendant's participation was a substantial factor in causing the tort.[34]

---

[32] *See*, *e.g.*, *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 930-31 (Tex. 2010); *Bailey v. Boka Powell, LLC*, No. 05-12-01012-CV, 2014 WL 427955 *5 (Tex. App.—Dallas Feb. 3, 2014); *see also*, *generally*, *Blankinship*, *supra*, 399 S.W.3d 303 (considering claims for aiding and abetting fraud as well as negligent misrepresentation).

[33] *See*, *e.g.*, *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996), citing, *inter alia* RESTATEMENT (2D) OF TORTS § 876(b).

[34] *See*, *e.g.*, *City of Ft. Worth v. Pippen*, 439 S.W.2d 660, 663-65 (Tex. 1969); *In re Dole Food Company, Inc*., 256 S.W.3d 851, 857 (Tex. App.—Beaumont 2008), citing RESTATEMENT (2D) OF TORTS § 876(c).

207.    The facts as alleged here show all Defendants to be liable under one or both aiding and abetting theories of recovery.   At all relevant times relevant, Defendants have aided and abetted one another in (a) the fraudulent schemes identified herein, (b) falsely misleading Plaintiffs as to the true state of the corporate Defendants' business affairs, (c) conspiring to violate the securities laws in connection with the Promissory Note-Fraud and CTH Stock-Fraud schemes, (d) diverting, and conspiring to divert Plaintiffs' investment funds and equity interests in FOG to themselves, and (e) self-dealing and other *ultra vires* acts, among other things.

208.    Defendants' efforts to conspire and aid and abet one another with the conduct complained of herein, led to the commission of fraud upon Plaintiffs.

209.    Defendants' false statements and promises, and failures to disclose, upon which Plaintiffs' justifiably relied, caused Plaintiffs injury, including actual damages.  *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

210.    As a direct and proximate result of such fraudulent conduct, Plaintiffs have suffered, and will continue to suffer, injury, loss, harm, or damage, which were a natural, probable and foreseeable consequence of Defendants' conduct.  As such, Plaintiffs are entitled to an award against all Defendants, jointly and/or severally, of all available economic, compensatory, exemplary, damages, attorneys' fees, costs, and pre- and/or post-judgment interest to the extent allowed by law, as well as appropriate equitable remedies (including but not limited to, to the extent available, disgorgement and/or receivership or constructive trust).

**COUNT 9:    ACCOUNTING – AS TO ALL DEFENDANTS**

211.    Plaintiffs incorporate the facts and allegations set forth above.

212.    Plaintiffs request an equitable accounting of the personal and corporate assets of each of the Defendants.

213.     Plaintiffs request the accounting for the purpose of determining the scope and extent of the fraud committed by Defendants and complained of herein and true amounts they are owed. Plaintiffs must have access to reasonable financial information allowing it to determine the calculation of its equity membership.  Plaintiffs requests access to all financial data, including all electronically stored information ("ESI"), related to each of the Defendants.

### COUNT 10:   IMPOSITION OF CONSTRUCTIVE TRUST OR RECEIVERSHIP – AS TO ALL DEFENDANTS

214.     Plaintiffs incorporate the facts and allegations set forth above.

215.     Texas law describes a constructive trust as:

[A]n equitable remedy created by the courts to prevent unjust enrichment. *Medford v. Medford*, 68 S.W.3d 242, 248 (Tex.App.-Fort Worth 2002, no pet.). To establish that a constructive trust exists, the proponent must prove (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res. *Mowbray v. Avery*, 76 S.W.3d 663, 681 n. 27 (Tex.App.-Corpus Christi 2002, pet. denied). The court will impose a constructive trust as an equitable remedy where there is a confidential relationship between a grantor and a grantee, and the grantor relies on the oral promise of the grantee to reconvey the property. *Fitz–Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256, 262–63 (Tex.1951); In re Marriage of Braddock*, 64 S.W.3d 581, 586 (Tex.App.-Texarkana 2001, no pet.).

*** 

While the form of a constructive trust is practically without limit, its existence depends upon the circumstances. *Bocanegra v. Aetna Life Ins. Co*., 605 S.W.2d 848, 851 (Tex.1980); *Simmons v. Wilson*, 216 S.W.2d 847, 849 (Tex.Civ.App.-Waco 1949, no writ). Whether a constructive trust should be imposed at all is within the discretion of the trial court. *Schneider v. Schneider*, 5 S.W.3d 925, 929 (Tex.App.-Austin 1999, no pet.).

*Hubbard v. Shankle*, 138 S.W.3d 474, 485 (Tex. App.—Fort Worth 2004, pet. denied).

216.     At all times relevant hereto, the Defendants' wrongful acts as alleged herein constituted a breach of a special trust, breach of fiduciary duty, and/or actual or constructive fraud that have led them to be unjustly enriched to the detriment of Plaintiffs.

217.    The wrongful acts complained of herein have allowed SHRG to be funded, operated and ultimately taken public as a result of their unlawful acts.  Defendants also, for the reasons discussed above with respect to Plaintiffs' unjust enrichment cause of action, have been unjustly enriched by obtaining, actively or passively, a benefit they should not be allowed to retain.

218.    Plaintiffs therefore request that a constructive trust or receivership be imposed on all property owned, in whole or in part, by each of the corporate Defendants, including SHRG, which was acquired and/or created in whole or in part by Plaintiffs' investments and as a result of the conduct complained of herein.

**COUNT 11:   BREACH OF FIDUCIARY DUTY – AS TO OBLON, BROCK, AND DOES 1-5**

219.    Plaintiffs incorporate the facts and allegations set forth above.

220.    In Texas, the elements of a Breach of Fiduciary Duty cause of action are: (1) the plaintiff and defendant had a fiduciary relationship; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach (a) injured the plaintiff or (b) benefited the defendant.[35]

221.    As the manager, member, and/or managing member of FOG, Oblon owed fiduciary duties to FOG's members, including Plaintiffs, as do FOG's members and directors, Does 1-5. Likewise, as managers, members, and/or managing members of FOG, Brock and Does 1-5 owed fiduciary duties to FOG's members, including Plaintiffs.

---

[35] *See*, *e.g.*, *Priddy v. Rawson*, 282 S.W.3d 588, 599 (Tex.App.—Houston [14th Dist.] 2009, pet. denied).

222.    As fiduciaries, Defendants Oblon, Brock and Does 1-5 owed Plaintiffs the duties: (1) of loyalty and utmost good faith,[36] (2) of candor,[37] (3) to refrain from self-dealing (which includes dealings with others whose interests are tied to the fiduciary),[38] (4) to act with strict integrity toward the client,[39] (5) of fair, honest dealing,[40] and (6) of full disclosure[41] (including a duty to disclose all important information about any transaction, and to disclose any matters that might influence a fiduciary to act in a manner prejudicial to the Plaintiffs[42]).

223.    Defendants Oblon, Brock, and Does 1-5, acting intentionally and in bad faith or, at a minimum, negligently and/or recklessly, breached their fiduciary duties to Plaintiffs and other members of FOG in that:

(a)    they were required to put Plaintiffs' best interest above their own and the interest of other entities they own, control, or are affiliated with, but failed to do so;

(b)    they took action adverse against Plaintiffs by making fraudulent representations and material omissions and failing to correct these misrepresentations and omissions;

(c)    they took action adverse against Plaintiffs by utilizing Plaintiffs' investments for personal expenses and/or for personal gains, among other things, as well

---

[36] *Hawthorne v. Guenther*, 917 S.W.2d 924, 934 (Tex.App.—Beaumont 1996, writ denied).

[37] *Welder v Green*, 985 S.W.2d 170, 175 (Tex.App.—Corpus Christi 1998, pet. denied); *see also Hawthorne*, 917 S.W.2d at 934.

[38] *Dearing, Inc. v. Spiller*, 824 S.W.2d 728, 73 (Tex.App.—Fort Worth 1992, writ denied).

[39] *Hartford Cas. Ins. Co. v. Walker Cty. Agency, Inc*., 808 S.W.2d 681, 687-88 (Tex.App.—Corpus Christi 1991, no writ).

[40] *Kelly v. Gaines*, 181 S.W.3d 394, 414 (Tex.App.—Waco 2005), rev'd on other grounds, 235 S.W.3d 179 (Tex. 2007); *Kinzbach Tool Co. v. Corbett-Wallace Corp*., 160 S.W.2d 509, 512 (Tex. 1942).

[41] *Johnson v. Peckham*, 120 S.W.2d 786, 788 (Tex. 1938)

[42] *Western Reserve Life Assur. Co. v. Graben*, 233 S.W.3d 360, 374 (Tex.App.—Ft. Worth 2007, no pet.); *Welder v. Green*, 985 S.W.2d 170, 175 (Tex.App.—Corpus Christi 1998, pet. denied); *Chien v. Chen*, 759 S.W.2d 484, 495 (Tex. App.—Austin 1988, no writ).

as, upon information and belief, Ponzi payments to other similarly situated investors in FOG (or other failed Oblon ventures) to keep the Promissory Note-Fraud scheme (and other Oblon schemes) afloat;

(d)      they failed to disclose to Plaintiffs that FOG's assets would be transferred (secretly or otherwise) to successor entities (whether by name change, consolidation, merger or otherwise), including Elepreneurs, Elevacity and/or FOHI, and excluding Plaintiffs from their ownership interests in FOG and the proceeds resulting from the acquisition of these companies by SHRG;

(e)      they failed to compensate Plaintiffs for their equity and ownership interests in FOG;

(f)      for further allegations, *See* Counts 1 and 2, and paras. 41 – 71 and 72-100, which are incorporated here by reference.

224.    Oblon and Does 1-5, not only ignored their fiduciary duties to its members, including Plaintiffs, but also intentionally and in bad faith, grossly mismanaging FOG, taking action (and failing to take reasonable action) to protect member investments, including Plaintiffs', and to mitigate potential losses.

225.    As a direct and proximate result of these counter-defendants' breaches of fiduciary duty (including the duties of loyalty and care), Plaintiffs have been damaged.  For the reasons detailed above, Defendants Oblon, Brock and Does 1-5 have repeatedly breached each and every one of these fiduciary duties to Plaintiffs, and they are therefore entitled to an award of actual,

economic, mental anguish, exemplary[43] and other damages, as well as an accounting[44], profit disgorgement, recession, interest, court costs, and all other relief to which they may be entitled.

## V.
## EXEMPLARY DAMAGES

226.    Plaintiffs incorporate the facts and allegations set forth above.

227.    The injuries sustained by Plaintiffs resulted directly from the willful and intentional fraud, deceit, gross negligence and/or actual malice complained of herein.  TEX. CIV. PRAC. & REM. CODE § 41.003(a).  As such, Plaintiffs are entitled to exemplary damages.  Further, the exemplary damages should be uncapped pursuant to TEX. CIV. PRAC. & REM. CODE § 41.008(c)(11) because Defendants, as alleged herein, secured the execution of the Note Purchase Agreements and the Subscription Agreements by deception.

## VI.
## ATTORNEYS' FEES

228.    Plaintiffs incorporate the facts and allegations set forth above.

229.    Pursuant to the TEX. CIV. PRAC. & REM. CODE, the TEX. BUS. & COM. CODE (including but not limited to TEX. BUS. & COM. CODE §§ 27.01(b)-(e); TEX. CIV. PRAC. & REM. CODE §§ 37.009 and/or 38.001), equitably (in light of Defendants' wrongful acts as alleged herein)[45], and/or pursuant to other applicable authority, Plaintiffs are entitled to recover their reasonable and necessary attorneys' fees, costs and expenses.

---

[43] *See*, *e.g.*, *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 584 (Tex. 1963); *Brosseau v. Ranzau*, 81 S.W.3d 381, 396 (Tex.App.—Beaumont 2002, pet. denied) (also holding that breach of fiduciary duty is shown to be "intentional" when the defendant merely *intends to gain an additional, unwarranted benefit* – here, Defendant intended, among other things, to gain additional fees, commissions, assets and/or client referrals and other benefits from Ms. Tang, and/or from their many businesses and business contacts).

[44] Pursuant to *Texas State Bank v. Amaro*, 87 S.W.3d 538, 543 (Tex. 2002); TEX. PROP. CODE §§ 113.151-.152, 111.0035(b)(4)(A); and 114.008(a)(4); and/or other applicable authority.

[45] *See*, *e.g.*, *Anglo-Dutch Petroleum Intern., Inc. v. Case Funding Network, LP*, 441 S.W.3d 612, 635 (Tex. App.—Houston [1st Dist.] 2014).

## VII.
## <u>CONDITIONS PRECEDENT</u>

230.    Plaintiffs incorporate the facts and allegations set forth above.

231.    All conditions precedent to Plaintiffs' claims for relief have been performed. Alternatively, all conditions precedent to Plaintiffs' claims should be excused based upon the conduct complained of herein.

## VIII.
## <u>JURY DEMAND</u>

232.    Plaintiffs demand a trial by jury.

## IX.
## <u>PRAYER</u>

233.    Wherefore, Plaintiffs respectfully requests that this Court award a judgment against Defendants for the following:

      a.    The immediate imposition of a constructive trust or appointment of a Receiver over all property owned, in whole or in part, by Defendants, which was acquired and/or created in whole or in part by Plaintiffs' investments in FOG as a result of the conduct complained of herein;

      b.    An equitable accounting of such funds and personal and corporate assets of each of the Defendants;

      b.    Actual damages;

      c.    Exemplary damages uncapped pursuant to TEX. CIV. PRAC. & REM. CODE § 41.008(c)(11) because Defendants secured execution of the Note Purchase Agreements, Settlement and Release Agreements and the Subscription Agreements by deception;

      d.    Attorneys' and expert fees for Defendants' statutory fraud pursuant to TEX. BUS. & COM. CODE § 27.01(b)-(e);

e.      Attorneys' fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001), equitably (in light of Defendants' wrongful acts detailed in this Complaint),[46] and/or pursuant to other applicable authority.

f.      Costs, including costs of court;

f.      Pre- and post-judgment interest;

g.      A finding of joint and several liability; and,

h.      All other relief to which Plaintiffs are entitled.

Respectfully submitted,

By: */s/ Stephen W. Abbott*_____

Tom Bayko
Texas Bar No. 01864500
Matthew J.M. Prebeg
Texas Bar No. 00791465
Christopher M. Faucett
Texas Bar No. 00795198
Stephen W. Abbott
Texas Bar No. 00795933
Brent T. Caldwell
Texas Bar No. 24056971

**BAYKO, PREBEG, FAUCETT & ABBOTT PLLC**
8441 Gulf Freeway, Suite 307
Houston, Texas 77002
Tel: (832) 742-9269
Fax: (832) 742-9261
tbayko@bpfalawfirm.com
mprebeg@bpfalawfirm.com
cfaucett@bpfalawfirm.com
sabbott@bpfalawfirm.com
bcaldwell@bpfalawfirm.com

---

[46] *See, e.g., Anglo-Dutch Petroleum Intern., Inc. v. Case Funding Network, LP,* 441 S.W.3d 612, 635 (Tex. App.—Houston [1st Dist.] 2014).

Aaron M. McKown
Texas Bar No. 24081612
(application for admission/*pro hac vice* to be filed)
Andrew M. Sussman
California Bar No. 112418
(*pro hac vice* to be filed)

**MCKOWN BAILEY**
3334 E. Coast Hwy #705
Corona del Mar, CA 92625
(949) 878-6878
aaron@mckownbailey.com
andrew@mckownbailey.com

**COUNSEL FOR PLAINTIFFS**